COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Moon, Judges Willis and Fitzpatrick
Argued by Teleconference


COMMONWEALTH OF VIRGINIA
                                          OPINION BY
v.        Record No. 1739-96-4    JUDGE JERE M. H. WILLIS, JR.
                                      NOVEMBER 27, 1996
CHARLES JOSEPH TALBERT


        FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                    Donald H. Kent, Judge

        Marla Graff Decker, Assistant Attorney
        General (James S. Gilmore, III, Attorney
        General, on brief), for appellant.

        Richard C. Goemann, Senior Assistant Public
        Defender (Office of the Public Defender, on
        brief), for appellee.


        In this appeal, taken pursuant to Code § 19.2-398, the

Commonwealth contends that the trial court erred when it

suppressed evidence based upon its finding (1) that the police

officers were not in hot pursuit of the defendant when they

followed him into a residence, and (2) that no exigent

circumstances necessitated the officers' entry into the

residence.  We agree and reverse the order of suppression.

        Talbert contends that the Commonwealth is barred from

raising on appeal the issue whether the evidence established

exigent circumstances necessitating the officers' entry into the

residence.  He argues that "the Commonwealth's petition for

appeal did not raise the issue of whether the officers' entry

into the residence was proper because it involved exigent

circumstances necessitating immediate action."  The record does

not support this contention. The Commonwealth's petition stated the question, "Was the evidence properly suppressed where the officers were in hot pursuit or exigent circumstances were present?" This question clearly embraces the issue of exigent circumstances.

On the evening of March 16, 1996, Officer William Bunney, along with other officers of the Alexandria Police Department, was engaged in undercover surveillance. At about 6:15 p.m., while it was still "light out," Bunney saw two men and a woman walking north in the 800 block of North Alfred Street. They stopped at the southeast corner of Alfred and Montgomery Streets, where they remained "for a period of time[,] looking around." Then they walked away.

About twenty minutes later, Talbert "came into the area from the north," accompanied by several other people. Talbert was in a wheelchair. The group stopped at the same southeast corner and remained there, just "hanging out." One of the two men who had previously stopped at the corner returned, accompanied by the same woman. The woman spoke to Talbert, who then spoke to a man standing behind him. That man began pushing the wheelchair north, followed by the man and woman and by two other men from Talbert's group. They all stopped at an alley on the east side of the 900 block of North Alfred Street. The two men from Talbert's group "stayed at the mouth of the alley at the street." Talbert, the man who was pushing the wheelchair, and the man and

woman, entered the alley, out of Bunney's view.

Shortly thereafter, Talbert and the others returned from the alley. The man and woman stood directly beside Talbert, who had his hands in front of him on his lap. Bunney saw a "very large rock of crack cocaine in a plastic bag" in Talbert's hand. Talbert broke a piece from the large chunk and placed it in the right hand of the man, who was standing beside him. The man looked at Talbert. The woman began walking toward the mouth of the alley and the man followed her with the piece of "rock" in his hand. He stopped momentarily, looked at "the rock" again, and then left with the woman. Talbert wrapped plastic around the large rock and placed it on the right side of his body.

Bunney radioed a description of the man and woman to the other officers and continued to monitor and report their location so that the officers could arrest them. The officers approached the man who had acquired the cocaine, but he put the rock in his mouth and resisted. That cocaine was not recovered.

Looking again, Bunney did not see Talbert or his group at the entrance to the alley or in the alley itself. He radioed for the officers in the street to "come into the area quickly," because he could no longer locate Talbert. He gave a description of Talbert and identified him by name.

Bunney then saw a man backing Talbert's wheelchair into the second house in the 900 block of North Alfred Street, "directly adjacent off of the alley where the transaction had taken place."

The man was lifting the wheelchair up the porch steps and was backing into the house.  Bunney did not know who owned the house.  He radioed the location to the officers in the street and instructed them to arrest Talbert for distribution of cocaine.  He also told them that Talbert "had more dope on him . . . [a] large rock. . . ."  He told the officers to hurry because Talbert "was being wheeled into the unit."

Officer Ballenger, who knew Talbert by name, and another officer proceeded to the "second to the end house in the east side alley of the 900 block."  Ballenger saw a man "with his back to the door" and his hands out in front of him, "walking back into the house itself."  The "exterior" door, which had glass only for its upper half, was partially obstructing the officer's view.  Ballenger could, however, see "wheels down below the door."  It appeared to him that the man with his back to the inside of the house was lifting a wheelchair into the house.  Ballenger recognized Talbert's face through the glass portion of the exterior door.

Ballenger, believing that he had probable cause to arrest Talbert, got out of the van in which he and the other officer were traveling and ran to the door.  The exterior door was still "open about a foot" and the inside door was completely open.  He saw Talbert in the living room, still in the wheelchair.  Ballenger announced "Police" in a loud voice, opened the exterior door, and went inside.  Talbert had his right hand behind the man

who was behind his wheelchair.  Ballenger saw something fall "in the exact place where Mr. Talbert's hand was" located.  Ballenger found a "very large rock of crack cocaine" where the object had fallen.  He then arrested Talbert.

Talbert moved the trial court to suppress as evidence the rock of crack cocaine found by Ballenger on the ground that the discovery was the product of an illegal search.  He argued that Ballenger's entry into the house without a search warrant was presumptively unreasonable and that the circumstances provided no exception to the warrant requirement.  The Commonwealth argued that Ballenger was in hot pursuit of Talbert and that exigent circumstances required and justified his warrantless entry into the house.

> The trial court held:
>> [T]hat there is no evidence to indicate that the Defendant knew that the police had him under surveillance or that they were about to arrest him when they entered the home.  The Court finds that this is not a hot pursuit case.  The motion to suppress is granted.

The trial court further held, apparently in reference to Verez v. Commonwealth, 230 Va. 405, 410-11, 337 S.E.2d 744, 753 (1985), cert. denied, 479 U.S. 813 (1986):

>> If you would look at those 10 points in that Virginia Supreme Court [case], I don't think the Commonwealth meets any one of the 10, maybe one of them, the fact that they had probable cause to believe that a crime had been committed.  But other than that, other than number 7, I'm not sure that you have met any of the 10.

"[T]he Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980).  However, exigent circumstances may justify as reasonable a warrantless entry into a dwelling for purposes of search or arrest.  Verez v. Commonwealth, 230 Va. 405, 410, 337 S.E.2d 744, 752-53 (1985), cert. denied, 479 U.S. 813 (1986).  One such exigent circumstance is hot pursuit.

We have found no case that specifically defines "hot pursuit."  However, we think that the term is self-defining.  A pursuit is "hot" if the circumstances are such that breaking off or delaying the chase for the time required to obtain a warrant is likely to involve significant danger to any person, loss of evidence, or opportunity for the suspect to escape.

Talbert contends that for a pursuit to be "hot," the suspect must be in flight, knowing that he is being pursued.  He has cited cases in which scenarios including that circumstance have been held to constitute "hot pursuit."  However, he has identified no case, nor have we found any, in which that circumstance was held to be a requirement for "hot pursuit."  The term "hot pursuit," as well as the other exigent circumstances that have been held to justify warrantless intrusions, relates to the circumstances governing the officer's conduct, to the situation as reasonably perceived by the officer, and must be

- 6 -

assessed from the officer's perspective.  Elusive action by the suspect will bear on this assessment, but the suspect's awareness and perceptions are not, as such, determinative.

In support of its argument that Ballenger entered the house in hot pursuit of Talbert, the Commonwealth cites Warden v. Hayden, 387 U.S. 294 (1967), and United States v. Santana, 427 U.S. 38 (1976).  In Hayden, the police were informed that a suspect, wanted in connection with an armed robbery, had entered a residence less than five minutes before.  Upholding a warrantless entry by the police for the purpose of apprehending the suspect, the Supreme Court said:

> [The police] acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them.  The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others.  Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

Hayden, 387 U.S. at 298-99.

Hayden did not specifically employ the term "hot pursuit." Talbert argues that Hayden was not decided on the basis of "hot pursuit," but rather on the exigent circumstances of the seriousness of the crime and the dangerousness of the suspect. However, the Supreme Court has cited Hayden as a "hot pursuit"

- 7 -

case.  See Welsh v. Wisconsin, 466 U.S. 740, 750 (1984).  See also Lugar v. Commonwealth, 214 Va. 609, 629, 202 S.E.2d 894, 909 (1974).  Although Hayden was unaware that he was being pursued, the urgency of the timing and of the circumstances confronting the police constituted their entry into the house a "hot pursuit."

In Santana, the police made a controlled heroin purchase. They returned to arrest the seller.  The suspect was standing in the doorway of her house.  When the police approached and announced themselves, the suspect attempted to flee into the house and was caught in the vestibule.  The Supreme Court held that the warrantless entry by the police into the vestibule of the house was a true "hot pursuit."  Santana, 427 U.S. at 42-43.  The Supreme Court noted that as the police approached, the suspect was standing outside of the house, amenable to warrantless arrest.  It held that she could not defeat the ability of the police to affect the arrest by flight into the house.  Id. at 42.  See also United States v. Sewell, 942 F.2d 1209 (7th Cir. 1991); United States v. Fleming, 677 F.2d 602 (7th Cir. 1982).

In Verez v. Commonwealth, 230 Va. 405, 337 S.E.2d 744 (1985), cert. denied, 479 U.S. 813 (1986), the police, using undercover informants, arranged for a large cocaine purchase to be made in a motel in Hanover County.  The target of the investigation was a drug dealer who had another man with him and

who was known to be armed and elusive. Until the police received a predetermined signal from one of the informants, they did not know the exact location of the transaction and did not have specific information that the drugs were, in fact, on the premises. Upon receiving the prearranged signal, the police burst into the room, arrested Verez, and seized a large amount of cocaine. Upholding the warrantless entry into the motel room, the Supreme Court said:

> Exigent circumstances . . . may justify as reasonable a warrantless entry into a dwelling, a search of the interior, a seizure of contraband, and an arrest of those found in possession of it. Such warrantless entries into dwellings, followed by searches, seizures, and arrests therein, however, are presumed to be unreasonable, in Fourth Amendment terms, casting upon the police a heavy burden of proving justification by exigent circumstances.

Id. at 410, 337 S.E.2d at 752-53. Noting that no court had attempted to formulate a final and comprehensive list of all exigent circumstances which might justify warrantless entry, the Supreme Court enumerated as "some of those considered relevant," ten categories of circumstance, including "hot pursuit." Id. at 410-11, 337 S.E.2d at 753. The Court did not represent this list to be complete or exclusive. The Court did not state that more than one such circumstance was required.

This case is controlled by Hayden, Santana and Verez. We hold that Ballenger entered the house in "hot pursuit" of Talbert. Just a few minutes before, Bunney had seen Talbert sell

a piece of cocaine to the man and woman whom he had met on the street. Bunney had seen Talbert secrete the large remaining block of crack cocaine next to his person in the wheelchair. While the officers elected first to apprehend the purchasers, they moved immediately, and without delay, to locate and apprehend Talbert. Bunney spotted Talbert first and ordered Ballenger to hurry. Ballenger came on the scene hastily and saw Talbert not yet in the house. He immediately pursued him and Talbert entered the house as Ballenger approached. The outer door did not close completely and the inner door remained open. Without interrupting the chase, Ballenger entered the house immediately, through the still open door, apprehended Talbert and secured the piece of cocaine. Had Ballenger failed to do so, Talbert might have learned that the police were on his trail. He might have eluded apprehension and might have disposed of the large piece of crack cocaine.

In addition to the circumstances of "hot pursuit," general exigent circumstances controlled Ballenger's conduct. A police officer had observed Talbert commit a crime and had observed him place material and easily disposable evidence of that crime on his person. Talbert was seen entering a house, the ownership and occupancy of which was at that time unknown. The officers did not know how long Talbert would remain in the house or what he would do while there. The officers had good cause to believe that their apprehension of the purchasers would become known.

The large rock of cocaine, known to be on Talbert's person, was easily disposable, by sale, consumption, or destruction.  The officers had good cause to suspect that Talbert and the people with him were armed and dangerous.  See Pequese v. Commonwealth, 19 Va. App. 349, 353, 451 S.E.2d 412, 414 (1994) (en banc).

The exigent circumstances described by the testimony, and specifically the circumstance of hot pursuit, justified Officer Ballenger's warrantless entry into the house, his apprehension of Talbert, and his seizure of the rock of crack cocaine.  The trial court erred in ordering the crack cocaine to be suppressed as evidence.

The judgment of the trial court is reversed, and this case is remanded for further proceedings.

Reversed and remanded.