2001 SD 92

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Jerry A. LAMONT, Defendant and Appellant.**

**No. 21189.**

Supreme Court of South Dakota.

Argued Oct. 24, 2000.

Decided July 11, 2001.

Mark Barnett, Attorney General, Ann C. Meyer, Assistant Attorney General, Pierre, SD, Attorneys for plaintiff and appellee.

Timothy J. Rensch, Rapid City, SD, Attorney for defendant and appellant.

[¶ 1.] **Justice Robert A. Amundson delivers the majority opinion of the Court on Issue 1, which holds that the trial court erred in refusing to admit evidence on the decedent's blood alcohol level.**

[¶ 2.] **Justice John K. Konenkamp delivers the majority opinion of the Court on Issues 2 and 3, holding the search of Lamont's dwelling was reasonable under the Fourth Amendment and the circuit court did not err when it allowed evidence of a second blood test.**

AMUNDSON, Justice, writing for the majority on Issue 1.

[¶ 3.] Jerry Lamont appeals his conviction for vehicular homicide and felony hit and run. We affirm Issues 2 and 3, reverse on Issue 1, and remand for a new trial.

## FACTS

[¶ 4.] On May 2, 1999, Ronald Dean Hall was killed while riding his motorcycle in Rapid City, South Dakota. Mr. Hall was discovered lying beside the road by a passer-by shortly before he died. Due to white paint found on the motorcycle, the accident scene indicated that a white vehicle hit the victim. A witness also observed a small white vehicle flee the accident area. Based on the initial accident investigation, the police believed that another vehicle involved ran the stop sign and collided with Hall's motorcycle.

[¶ 5.] While the investigation of the accident scene was proceeding, Officer Rud and Olson were dispatched to the Horseshoe Motel on an unrelated matter. Prior to this, they had received an all-points bulletin regarding the hit-and-run accident. Upon their arrival, Officer Rud noticed a white Ford Escort matching the description of the car described in the all-points bulletin. The Escort had a dented left front quarter-panel, a smashed windshield, blood spots inside the car, and blood on the driver's side door handle.

[¶ 6.] Upon these observations, Officer Rud requested the investigator at the accident to come to the motel with broken parts found at the accident scene. It was determined that these broken parts fit into the damaged area of the Ford Escort. Next, Officer Rud called in the Ford's license plate number, which revealed the owner as Jerry Lamont whose address was the Horseshoe Motel, room # 15.

[¶ 7.] Officer Rud advised his supervisor of their findings and asked to enter room # 15. After receiving such permission, the officers knocked on the door with no response. The officers observed that the door was unlocked and entered the unoccupied premises (first search). After entering, the officers conducted a search of the bedroom, living room, and bathroom, where they noticed blood spots in the bathroom sink and a bloody pair of pants lying on the bedroom floor.

[¶ 8.] Officer Rud relayed the findings of the search to Sergeant Vlieger. Upon his arrival at the police station, Vlieger directed Rud to return to the motel and secure the area while he made arrangements to get a search warrant. Upon

returning, the officers noticed that the door was locked and the lights were off. Again, Rud knocked on the motel room door with no answer. Officer Rud called the manager so that he could let them into the room. The manager unlocked the door and Officer Rud gained entrance to the room (second search). Lamont was found therein where he was observed with fresh cuts on his nose and head.

[¶ 9.] Lamont was asked to come to the police station where he was arrested for vehicular homicide, second-degree manslaughter, and hit and run. Upon receiving *Miranda* warnings, he was instructed to give two blood samples. Per police instruction, each sample was taken with an hour interval between the two tests.

[¶ 10.] Prior to trial, the court ruled that emergency circumstances did not exist,[1] thus this facet of the "exigent circumstances" exception to the warrant requirement did not apply and suppressed all evidence relating to the first search. Despite police not having a warrant to search Lamont's room, the court denied Lamont's motion to suppress the second search of Lamont's dwelling determining the search was justified to "effectuate a custodial interrogation." The court also held Lamont's blood tests were obtained incident to lawful arrest. The court granted the State's motion in limine prohibiting defense counsel from eliciting testimony or commenting on the decedent's apparent blood alcohol level at the time of the accident.

[¶ 11.] Lamont appeals raising three issues:

1) Whether the trial court abused its discretion by granting the State's motion in limine to forbid the defense to question or comment on the decedent's apparent blood alcohol level at the time of the accident.

2) Whether the trial court erred by upholding the second search of Lamont's dwelling.

3) Whether a second blood draw performed by the police was reasonable under the fourth amendment.

## STANDARD OF REVIEW

[¶ 12.] Our review of a motion to suppress based on an alleged violation of a constitutionally protected right is a question of law examined de novo. *See State v. Hirning,* 1999 SD 53, ¶ 9, 592 N.W.2d 600, 603; *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996) (standard of review for questions under the Fourth Amendment); *United States v. Khan,* 993 F.2d 1368, 1375 (9thCir.1993). We review findings of fact under the clearly erroneous standard. *See State v. Almond,* 511 N.W.2d 572, 573–74 (S.D.1994). Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo. *Spenner v. City of Sioux Falls,* 1998 SD 56, ¶ 13, 580 N.W.2d 606, 610. Whether police had a "lawful basis to conduct a warrantless search is reviewed as a question of law." *State v. Sleep,* 1999 SD 19,

---

1. This determination made by the trial court was based on the facts that the time elapsed upon observing the blood and actually entering the motel room of Lamont was over an hour; that blood alone is not indicative of a crime and could possibly be explained through alternative means; and that testimony of the on-the-scene officers did not treat it as an emergency: no rubber gloves were used, they did not call for an ambulance nor did they bring their medical kit along to provide assistance if someone was actually injured inside Lamont's motel room. The court found that based on these facts, the purpose of entering the room was to investigate a possible crime, and not to provide medical assistance.

¶ 6, 590 N.W.2d 235, 237 (citing *State v. Krebs*, 504 N.W.2d 580, 585 (S.D.1993) (citation omitted)). Thus, on the issue of whether an exception to the warrant requirement applies is reviewed de novo.

## DECISION

### Issue 1. Decedent's Blood Alcohol Level

[¶ 13.] Prior to trial, the State argued that the decedent's blood alcohol level was irrelevant to Lamont's criminal culpability and sought an order to prohibit defense counsel from any mention of it. The trial court granted the State's motion in limine. In its attempt to prove that Lamont failed to stop at a stop sign, the State put forth evidence that the reaction time for an average person was 1.6 seconds. At trial, the defense wanted to controvert the State's expert on perception reaction time of the general motoring public. The defense asked the State's accident reconstructionist whether his figures would be accurate if the victim was legally drunk. For this, defense counsel was fined for violating the terms of the motion in limine. On appeal, Lamont argues that the excessive speed and intoxication of the decedent was relevant to the issue of proximate cause.

[¶ 14.] One method traditionally taken by the defense is to attack the elements of the offense charged. Generally, the defense does this by putting on evidence that creates a reasonable doubt as to whether a particular element was satisfied. In question is the element of proximate cause. The jury instruction for vehicular homicide, in pertinent part, reads as follows: The state must prove beyond a reasonable doubt:

1. That the defendant at the time and place alleged in the Information operated or drove a motor vehicle in a negligent manner.

2. That the defendant at the time and place was under the influence of an alcoholic beverage.

3. That the negligent operation or driving *was a proximate cause of* the death of Ronald Hall.

4. That the defendant did so without a design to effect the death of Ronald Hall.

This instruction reflects a correct statement of law. *State v. Two Bulls*, 1996 SD 53, ¶ 14, 547 N.W.2d 764, 766. The State claims that our holding in *Two Bulls*, however, precludes the defense from raising a defense based on contributory negligence.

[¶ 15.] In *Two Bulls*, the victim was a passenger in the vehicle rather than a driver. Moreover, Two Bulls was not under the influence, nor did the prosecution open the door by proffering expert testimony as to causation. The thrust of the State's argument is that the defense should not be able to use the decedent's blood alcohol level in any way because the decedent's contributory negligence is irrelevant. The issue at hand, however, is whether the defense should be allowed to put on a defense that includes the use of the decedent's blood alcohol level where decedent was operating the other vehicle involved in the accident as to show that it constitutes an "independent intervening cause" and the "proximate cause of the death." *See Two Bulls, supra*, at ¶ 13 (citing *State v. Rotella*, 196 Neb. 741, 246 N.W.2d 74, 76 (1976)). Our decision in *Two Bulls* does not preclude Lamont from offering evidence in support of his defense.

[¶ 16.] When a defendant is denied the ability to respond to the State's case against him, he is deprived of "his fundamental constitutional right to a fair opportunity to present a defense." *Crane v. Kentucky*, 476 U.S. 683, 687, 106 S.Ct.

2142, 2145, 90 L.Ed.2d 636 (1986). We cited in *State v. Iron Necklace,* 430 N.W.2d 66, 75 (S.D.1988), notions of fundamental fairness require "that criminal defendants be afforded a meaningful opportunity to present a complete defense." See also *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). It is only fair that a defendant in a criminal trial be allowed to present his theory of the case.

■ [¶ 17.] Although Lamont argues on appeal that the decedent's blood alcohol level is relevant to his defense in challenging proximate cause, his nebulous argument to the trial court does not address the independent-intervening cause aspect of the case.[2] Since we are remanding this case, it is incumbent upon Lamont to present authority and clearly state why such questioning should be allowed. Lamont must show that the victim's intoxication level is related to the issue of proximate cause, not contributory negligence. While this Court recognizes that this may be perceived as "a second bite at the apple," we are mindful that a defendant in a criminal case should be afforded the opportunity to challenge any element of the crime charged and present a complete and valid defense.

[¶ 18.] We reverse on this issue and remand for a new trial.

[¶ 19.] MILLER, Chief Justice, and SABERS, KONENKAMP, and GILBERTSON, Justices, concur.

KONENKAMP, Justice, writing for the majority on Issues 2 and 3.

### Issue 2. Warrantless Entry into Lamont's Dwelling

[¶ 20.] Lamont argues that the second search of his dwelling was accomplished in violation of the Fourth Amendment. The police entered his motel apartment without a warrant, claiming a medical emergency. The trial court expressly rejected this rationale. It ruled that the "health and well-

---

2. It is true that a defendant in a criminal case can be convicted of a crime when his or her conduct is one of many causes for the resulting death. *See Two Bulls, supra; State v. Theuring,* 46 Ohio App.3d 152, 546 N.E.2d 436 (1988); *State v. William,* 231 Neb. 84, 435 N.W.2d 174 (1989). There may be, however, circumstances where the actions of someone other than the defendant are the proximate cause. As stated in *Two Bulls,* "the negligence or unlawful acts of another driver which proximately contributed to the death, *as distinguished from an independent intervening cause thereof,* [are] not a defense[.]" *Supra,* at ¶ 13 (emphasis supplied). Examples of where courts have drawn a distinction between an independent intervening cause and contributory negligence are: *Pagotto v. State,* 127 Md.App. 271, 732 A.2d 920, 966 (1999) ("It is possible for negligence of the deceased or another to intervene between his conduct and the fatal result in such a manner as to constitute a superceding cause, completely eliminating the defendant from the field of proximate causation"); *People v. Schmies,* 44 Cal.App.4th 38, 51 Cal.Rptr.2d 185, 192 (1996) ("An independent intervening act may be so disconnected and unforeseeable as to be the superceding cause; in such a case the defendant's act will be remote, and not the proximate cause"); *State v. Dionne,* 442 A.2d 876, 887 (R.I.1982) ("The deceased's negligence is irrelevant absent evidence that would support a finding that the deceased's conduct amounted to an independent intervening cause.... Before the trial judge is obligated to charge the jury regarding the consideration that may be given to the deceased's conduct in the case ... evidence must have been introduced which would indicate that the deceased's conduct was the sole cause of her death and that the defendant's conduct had nothing to do with the fatality."); *People v. Dunhill,* 40 Colo.App. 137, 570 P.2d 1097, 1098 (1977) ("Absent proof that it was an independent intervening cause the contributory negligence of the victim is not a defense in a prosecution for vehicular homicide"). As such, a defendant should not be foreclosed from putting forth evidence of independent-intervening causes.

being of the [d]efendant was not the [officers'] motivation." Nevertheless, the court concluded that the warrantless entry was reasonable and that it was done to accomplish a homicide investigation and arrest. In his appellate brief, Lamont asks, "Do we want to rely on why the police say they entered or do we want to try to think of a reason to justify their actions after the fact?"

[¶ 21.] It is important to keep in mind that we are not bound by the circuit court's legal conclusions: we review legal questions anew. *Hirning*, 1999 SD 53, ¶ 9, 592 N.W.2d at 603. "Fact findings are reviewed for clear error, but ultimately, in reviewing decisions on motions to suppress for asserted constitutional violations our standard of review is de novo." *State v. Morato*, 2000 SD 149, ¶ 10, 619 N.W.2d 655, 659 (citing *Ornelas*, 517 U.S. at 699, 116 S.Ct. at 1663, 134 L.Ed.2d at 920). Consequently, we are not constrained by the trial judge's legal rationale for upholding the entry. Nor are we bound by the officers' subjective justification. "[S]ubjective intentions play no role in ordinary, probable cause Fourth Amendment analysis." *Arkansas v. Sullivan*, —— U.S. ——, ——, 121 S.Ct. 1876, 1878, 149 L.Ed.2d 994, 997 (2001); *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996).

> The fact that [an] officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.

*Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). An objectively reasonable search based on probable cause will not be rendered invalid even when the motive for the search was pretextual. *See Sullivan*, —— U.S. at

——, 121 S.Ct. at 1878 (citations omitted). It is our duty to make our own legal assessment of the evidence to decide under the Fourth Amendment whether the officers' actions were "objectively reasonable." *See Maryland v. Buie*, 494 U.S. 325, 330, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Viewing the circumstances objectively, the police had exigent circumstances to justify entering the room and arresting the defendant for vehicular homicide and felony hit and run. Thus, the search and seizure did not violate Lamont's Fourth Amendment rights.

[¶ 22.] The State bears the burden of justifying a warrantless entry into a constitutionally protected area. *See Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970) (citations omitted); *State v. Meyer*, 1998 SD 122, ¶ 20, 587 N.W.2d 719, 723 (citations omitted). Before entering a suspect's residence to effect an arrest, an officer must possess an arrest warrant absent exigent circumstances. *Payton v. New York*, 445 U.S. 573, 602–03, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980). The exigency exception exists because some situations dictate immediate police response rather than delay to obtain a warrant from a judge. Exigency remains "within the narrow range of circumstances that present real danger to the police or the public or *a real danger that evidence or a suspect might be lost.*" *United States v. Bulman*, 667 F.2d 1374, 1384 (11th Cir.1982)(emphasis added). For example, in *United States v. Roper*, 681 F.2d 1354, 1357, n.1 (11th Cir. 1982), the arrest of a suspect in his motel room without a warrant was justified by exigent circumstances where (1) there were simultaneous multiple arrests at the conclusion of a drug transaction, and (2) there was a legitimate fear that the defendant would escape. Police must show probable cause and exigent circumstances

before making a warrantless entry into a person's home for a felony arrest. *Payton*, 445 U.S. at 589, 100 S.Ct. at 1381, 63 L.Ed.2d 639 (citations omitted).

### A.

[¶ 23.] The Supreme Court in *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), examined whether the need to obtain the blood-alcohol level of a driver who had fled the scene of an accident would constitute an "exigent circumstance." *Id.* at 742, 104 S.Ct. 2091. In *Welsh*, the driver lost control of his car and ended up in a field, causing no injury or damage. A witness who saw the driver walk away told the police that the driver was either inebriated or sick. The police went to the driver's house and entered after the driver's stepdaughter answered the door. They found the driver in bed, arrested him, and asked him to take an implied consent test. He declined. When his license was automatically suspended for refusing the blood test, he challenged the decision in court. *Id.* at 742–43, 104 S.Ct. 2091.

[¶ 24.] The United States Supreme Court held that neither exigent circumstances nor hot pursuit justified the entry into Welsh's home. *Welsh*, 466 U.S. at 753–54, 104 S.Ct. at 2099–2100, 80 L.Ed.2d 732. The Court relied heavily on the nature of the offense, which in Wisconsin is a civil forfeiture traffic violation where no imprisonment was possible. *See id.* There, the exigencies were insufficient to overcome the warrant requirement in the context of an arrest for a civil traffic offense. *Id.* Nonetheless, the Court held that an important factor in determining whether an exigency exists is "the gravity of the underlying offense for which the arrest is being made." *Id.* at 753, 104 S.Ct. 2091. *Welsh* stopped short of drawing a bright line between felonies and non-

felonies, but the opinion states that circumstances are more clearly exigent when the offense is a "serious crime." *Id.* at 752, 104 S.Ct. 2091. The reasoning in *Welsh* spawned a number of cases recognizing the proposition that blood alcohol dissipation may create a destruction of evidence exigency justifying a warrantless entry into a home. *State v. Komoto*, 40 Wash.App. 200, 697 P.2d 1025 (1985); *People v. Keltie*, 148 Cal.App.3d 773, 196 Cal. Rptr. 243, 247 (1983); *Stark v. New York State Dept. of Motor Vehicles*, 104 A.D.2d 194, 483 N.Y.S.2d 824 (1984).

### B.

[¶ 25.] In a case with striking similarities to our own, the Minnesota Supreme Court, sitting en banc, upheld a warrantless entry into a suspect's home after a hit and run. *See State v. Storvick*, 428 N.W.2d 55, 59 (Minn.1988)(distinguishing *Welsh* and upholding warrantless entry). Because the circumstances in *Storvick* are critical to our analysis, it is necessary to detail the facts of that case. A seventeen-year-old girl and her friend were walking alongside the road at 9:00 p.m. A car hit her, sending her flying through the air for over 100 feet. The car did not brake or slow before impact. It continued to drive without stopping. An ambulance and the police were dispatched to the scene moments later. The victim's friend told the officers what happened. She described the car as a brand new 1986 or 1987 model, white in color. *Id.* at 56.

[¶ 26.] The police investigation began immediately. Officers processing the scene found no skid or other tire marks. *Id.* Another officer went to the hospital and learned that the victim was unconscious with a severe head injury. In grave condition, she would be flown to Rochester in the hope that something could be done for her. An officer took several items of

clothing worn by the victim, including her right tennis shoe, the left one being missing. Meanwhile, the sheriff obtained some crash debris from deputies at the scene and proceeded to the local car dealership. After studying them, a parts department employee explained that the debris fragments were from the right front side and probably came from a Ford car manufactured after March 1985. Officers canvassed the area in an attempt to locate witnesses and a newer model white Ford with right front-end damage. *Id* at 56–57.

[¶ 27.] At 11:15 p.m., an officer spotted a white 1986 Ford Tempo with damage to its right front. The car was at an intersection approximately a half-mile from the scene of the accident. When the officer approached the vehicle, the driver, who was married to the defendant's sister, got out, saying, "Are you looking for this?" *Id.* at 57. The trooper said yes and asked the driver what he was doing. The driver explained that he had gotten off work a short time earlier and that the defendant's wife was at his mother's place looking for him. The driver found the defendant at home asleep in his bed and took the car keys from the bedroom and left. *Id.* The witness who was with the victim at the time of the accident was brought to the scene, and she positively identified the car as the one that hit the victim. The police determined that pieces of debris from the accident scene fit perfectly on the car. They checked and learned that the car belonged to the local Ford dealership, where the defendant was an employee. *Id.*

[¶ 28.] The officers decided to go immediately to the defendant Brandt Storvick's house. They arrived at 11:28 p.m., 2 ½ hours after the accident. As they approached the house, one officer found the victim's missing tennis shoe in the driveway. The residence was dark. The sheriff and a deputy rang the doorbell and pounded on the door. There was no response, but one of them heard a "thump." *Id.* They entered the attached garage through the open garage door and pounded on the door that led from the garage to the house. Still they got no response. The sheriff then opened the unlocked door into the family room, stepped inside, and announced that it was the sheriff's department. He asked if anybody was home, and yelled, "Brandt can you hear me? Anybody home? Hello, Brandt." *Id.* (Bracketed information omitted). Finally, the defendant said something from upstairs, and the sheriff replied, "This is Don Nolander from the Sheriff's Department. Brandt, we need to talk to you. Do you want to come downstairs or do you want us to come upstairs and talk to you?" *Id.* The defendant said he would be down.

[¶ 29.] When the defendant came down, the sheriff, who had learned that the victim was "brain dead," said, "Brandt, we are investigating a serious accident that is probably going to end up being a fatality, and we need to talk to you about that." *Id.* The defendant Storvick was in a stupor and responded, "I am too scared, I can't talk about anything" and "What are you doing in my house?" *Id.* The defendant was arrested for the felony offense of leaving the scene of a personal injury accident. *Id.* at 58. When the defendant was getting dressed, one of the officers noticed the odor of liquor on him. The officers told Storvick that they would be taking him to the hospital for a blood test with or without his consent. The defendant responded, "I drank after I got home." *Id.* When the officers checked the house to see if there was any evidence that the defendant had drunk liquor after he got home, they found none. The test later showed his BAC to be .19. The defendant was charged with several felonies, including vehicular homicide.

[¶ 30.] Using a de novo standard of review, the Minnesota Supreme Court reasoned: (1) The officers had strong probable cause to believe that Storvick had committed the very serious felony offense of either criminal vehicular operation or criminal vehicular operation resulting in death. To obtain a conviction for either offense, the prosecution had to show "grossly negligent driving" or "negligent driving by one who either was under the influence of alcohol or had a blood alcohol concentration of .10 or more." *Id.* at 59. (2) The "field investigation" began at 9:07 p.m., immediately after the accident, and it was ongoing and continuous up to the arrest. (3) The officers acted cautiously and with due regard for the rights and sensibilities of the people involved. They checked to match the damaged car with the pieces found at the scene. They also checked and found that the car belonged to the defendant's employer. When they went to the defendant's house 2 ½ hours after the accident they were satisfied that the defendant had been driving the car. After arriving at the scene, their certainty only increased on finding the victim's missing shoe in defendant's driveway. *Id.* at 59–60. (4) The defendant did not respond to the officers' repeated knocking and doorbell ringing, but the officers heard a "thump." They entered the attached garage through an open garage door and pounded on the door that led from the garage into the residence. Still there was no response. At that point the sheriff had a decision to make: attempt to obtain a warrant or proceed to enter the house without a warrant. *Id.*

[¶ 31.] The court concluded that the officers acted properly in entering the house without a warrant "because they had every reason to believe that defendant had been drinking and they needed to act as quickly as possible to precisely ascertain defendant's blood alcohol level before the evidence dissipated." *Id.* at 60. It is important to note, however, that the facts do not indicate that the officers had any direct evidence that the defendant had been drinking before they entered his home. Nor did they give as their reason for entry the need to get a blood sample. Yet the court stated:

Here, by fleeing the scene of the accident, defendant prevented the police from observing him and basing a probable cause assessment on their observations. However, there nonetheless was an *objective basis* for believing that it was necessary to scientifically ascertain defendant's blood alcohol level: (a) at a minimum, the police had strong evidence of negligently inattentive driving on defendant's part, the sort of inattention that often is explained by the defendant's being under the influence of alcohol; (b) it was the time of day that, when an accident such as this occurs, drinking is often found to be involved; (c) the fact that defendant not only did not slow down but fled the scene tended to suggest that he had been drinking, intoxication being a common reason people flee accidents; (d) [a family member's] statement to the police that defendant was asleep and that he got the keys from defendant's bedroom certainly fits in with the view that defendant was intoxicated or under the influence and had gone home and passed out; (e) the fact that defendant left the victim's shoe in the driveway perhaps tended to suggest that he was intoxicated or at least under the influence; and (f) the fact that defendant did not respond to the repeated loud knocking and doorbell ringing further suggested that defendant either had passed out or that he heard the police and was not going to answer because he had something to hide, most likely that he had been drinking. Con-

sidered together, these facts provided an *objective basis* for believing that it was necessary to ascertain defendant's blood alcohol level.

*Id.* at 60–61 (emphasis added). Finally, the court emphasized that the police were investigating the "extremely serious" offense of felony vehicular homicide, implying that the result might have been different "if the offense being investigated had been a less serious offense." *Id.* at 61. *See also United States v. Clement,* 854 F.2d 1116, 1119–20 (8thCir.1988)(citing *Welsh,* noting the necessity of looking to the gravity of the offense, and characterizing cocaine trafficking as "a serious offense" that justified entry into hotel room).

### C.

 [¶ 32.] Now, we examine the facts of our case. (1) The officers had strong probable cause to believe that the serious felony offenses of vehicular homicide and hit and run with injury had been committed. The victim died at the scene. To obtain a conviction for vehicular homicide under South Dakota law, the State had to show negligent driving by one who either was under the influence of alcohol or had a blood alcohol concentration of .10 or more. SDCL 22–16–41 (maximum penalty fifteen years). To obtain a conviction for felony hit and run, the State had to prove that the driver was involved in an accident resulting in injury or death to a person, that the driver failed to immediately stop and give his name and address, and that the driver failed to render the person injured reasonable assistance, including carrying such person to medical treatment if such treatment was necessary or was requested by the injured person. SDCL 32–34–3 (maximum penalty two years); (2) The "field investigation" began at 2:00 a.m., immediately after the accident, was ongoing at the time the defendant's car was spotted at the Horseshoe Motel at 4:00 a.m., and continued up to the arrest, which occurred between 5:00 and 6:00 a.m. The defendant's blood was drawn at 7:40 a.m. and again at 8:40 a.m. (3) The officers acted cautiously and with due regard for the rights and sensibilities of the people involved. They did not simply discover the damaged car and immediately seek entry into the motel room. They checked the registration of the car and found that it was registered to Lamont. Then they checked the registration at the motel and discovered that he was registered as living in Room 15. The damaged car was parked in front of that room. They checked to match the damaged car with the pieces found at the scene. Indeed, Officer Ronfeldt brought a piece found at the scene and put it next to a missing piece on the car. It fit perfectly. Furthermore, there was blood on the outside and the inside of the car, strongly indicating that both the driver and someone else outside the car had been injured. Thus, the officers could be reasonably satisfied that the person inside the room was the person who had been involved in the accident. Although a suspect living in a motel room does not of itself create an exigent circumstance allowing departure from the warrant requirement, the temporary nature of a rented room should certainly be a factor in deciding whether the requirement for a warrant is excused by exigency. (4) The defendant did not respond to the officers' repeated knocking for over five minutes. They then entered the unlocked room. The defendant was not present, but the TV and all the lights were on. There were bloody items in the room, only further confirming that the person in the room had been in the accident. (5) With nobody in the room, the officers decided to return to the station to relay the information to their supervisor. They were directed to go back to the room and secure it until a search

warrant could be obtained. However, when they returned they now found that the room was locked and the TV and lights were all turned off. The officers could get no response from anyone inside.

[¶ 33.] At that point, the police had a difficult decision to make: continue waiting outside until a search warrant could be obtained or proceed to enter the room without a warrant. The door that had been open before was now locked. Was the suspect in the room? If he had been drinking, the blood alcohol evidence was dissipating. Was he injured or unconscious? Or did he lock the door and flee? Were they guarding an empty room while waiting for a search warrant? Or was evidence being destroyed in the room, making a later obtained search warrant a useless exercise? Deciding to act, the officers had the motel manager open the room with the master key. They found the defendant inside and he made an incriminating comment when the officers came in. Some of the bloody items were gone, but the officers were able to secure a piece of clothing with blood on it.

[¶ 34.] All the relevant circumstances suggesting that the accident was alcohol related in *Storvick* also existed here: strong evidence of negligent, inattentive driving, with apparent failure to stop at a stop sign; the late hour (2:00 a.m.) when drinking is often involved in accidents; flight from the scene of the accident, indicating that the driver perhaps did not want to confront the police because of the possibility of intoxication; no response to repeated knocking, suggesting that the "defendant either had passed out or that he heard the police and was not going to answer because he had something to hide, most likely that he had been drinking." *See Storvick*, 428 N.W.2d at 60. As the Minnesota Supreme Court concluded, the facts in their totality "provided an *objec-*

*tive basis* for believing that it was necessary to ascertain defendant's blood alcohol level." *Id.* at 60–61 (emphasis added). The court found that "[t]he additional fact that 'the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system,' meant that '[t]here was no time to seek out a magistrate and secure a warrant.'" *Id.* at 61 (quoting *Schmerber v. California*, 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966)).

[¶ 35.] Indeed, although the officers did not give it as a reason for their decision to enter the room, Judge Tice in his oral findings remarked that as a basis for entering the room, the officers here needed to act quickly to preserve blood alcohol evidence: "[B]ecause of the nature of the fatality and time of day, there are possibilities, at least, of alcohol being involved." Judge Tice found that there were "reasons to believe that evidence might be diminished if the arrest [could not] be effected in a timely fashion."

[¶ 36.] With Fourth Amendment analysis, we generally avoid bright-line rules. *See e.g. Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996). The "endless variations in the facts and circumstances" involving the Fourth Amendment make per se rules difficult to apply. *Florida v. Royer*, 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983). Thus, like the Minnesota Supreme Court in *Storvick*, which limited its holding to the grave circumstances in that case, we need not decide whether the result would be the same if, for example, the offense under investigation had been less serious. *Storvick*, 428 N.W.2d at 61. But here an extremely serious offense occurred, and an objectively reasonable basis existed to enter the defendant's room.

**D.**

[¶ 37.] In discussing transitory evidence cases, Professor LaFave stresses the distinction between "planned" arrests and those made in the course of an ongoing "field investigation." 2 Wayne R. LaFave, Search and Seizure § 6.1(f), at 271–73 (3d ed. 1995). The Connecticut Supreme Court used LaFave's analysis in *State v. Guertin,* 190 Conn.440, 461 A.2d 963 (1983). In explaining this approach, the court stated:

[LaFave] defines a "planned" arrest as "one which is made after a criminal investigation has been fully completed at another location and the police make a deliberate decision to go to a certain place, either the arrestee's home or some other premises where he [or she] is believed to be, in order to take him [or her] into custody." In the "planned" arrest situation he suggests that any claimed exigent circumstances which may arise thereafter are foreseeable and therefore would not justify a warrantless entry unless the exigent circumstances are present before the police go into the field to make the arrest. On the other hand, he would not fault the police for not having an arrest warrant when the occasion for an arrest arises while the police are already out in the field investigating the prior or ongoing conduct which is the basis for the arrest.

*Id.* at 969. The *Guertin* court concluded that while the facts arguably presented a planned arrest, because there was no evidence that the police created the later emergency, their belief that the suspect might flee unless they moved quickly was reasonable. *Id.* at 969–70. Here, the officers went back to the motel, not planning to arrest the defendant, but intending to sit and wait for a search warrant. Yet when they arrived the circumstances had changed significantly. The evidence was no longer going to remain static in an empty motel room.

[¶ 38.] The spirit of the Fourth Amendment is reasonableness. Sitting in the sanctuary of our chambers with the advantage of hindsight, we may well analyze positions with exhaustive and clinical precision. But the officers acting in the wee hours of the night in the midst of their field investigation, with events changing and unfolding, had to use their best judgment in the moment. They were confronted with a difficult choice. Time became critical. Their subjective reason for acting quickly may not satisfy the Fourth Amendment, but nonetheless their actions in these circumstances were objectively reasonable. We therefore sustain the trial court's ruling.

### Issue 3. Second Blood Draw

[¶ 39.] Lamont does not challenge the evidence obtained from an initial blood draw taken by the police. Nonetheless, he asserts that the circuit court erred when it refused to suppress evidence obtained from the second blood draw taken within an hour of the first. The State's right to require, within constitutional limits, an individual to submit to a test of body fluids, including blood, is well established. *State v. Nguyen,* 1997 SD 47, ¶ 10, 563 N.W.2d 120, 122. Such an intrusion does not transgress the reasonableness requirements of the Fourth Amendment. *Schmerber,* 384 U.S. at 772, 86 S.Ct. at 1836, 16 L.Ed.2d 908 (1966). A blood draw is reasonable if it is accomplished incident to a lawful arrest, by a reliable and accepted method, in a medically approved manner, and with probable cause to believe the evidence sought exists. *Nguyen,* 1997 SD 47, ¶ 10, 563 N.W.2d at 122–23 (citations omitted).

[¶ 40.] Lamont sees no constitutional infirmity in taking the first blood sample,

and we can see little reason to fault taking the second, especially as they were taken an hour apart. With two blood samples the laboratory could more accurately extrapolate Lamont's BAC at the time of the accident. Indeed, a second draw in some instances may elicit exculpatory evidence for those who consume alcohol after an accident occurs. As previously stated, bright line rules are generally undesirable in Fourth Amendment jurisprudence. *Robinette*, 519 U.S. at 39, 117 S.Ct. at 421, 136 L.Ed.2d 347. Courts must be allowed to consider the facts and circumstances in each case. Considering the totality of circumstances in this case, a second blood draw was reasonable.

[¶ 41.] Affirmed on Issues 2 and 3, reversed on Issue 1, and remanded for a new trial.

[¶ 42.] MILLER, Chief Justice and GILBERTSON, Justice, concur.

[¶ 43.] SABERS, Justice, concurs in part and dissents in part.

[¶ 44.] AMUNDSON, Justice, dissents.

SABERS, Justice (concurring in part and dissenting in part).

[¶ 45.] I concur in Issue 1.

[¶ 46.] I join Justice Amundson's dissent in Issue 2.

[¶ 47.] I join Justice Amundson's dissent in Issue 3 under these limited circumstances, but write specially to emphasize that it is foreseeable there *may* be numerous situations in the future where a second blood alcohol content test would be justified.

---

**3.** I need not address the other State's proffered exception to the warrantless requirement as the trial court expressly rejected the

AMUNDSON, Justice (dissenting).

[¶ 48.] I dissent on issues 2 and 3 for the forgoing reasons.

### Issue 2. Warrantless Entry into Lamont's Dwelling[3]

[¶ 49.] *A. Search incident to lawful arrest*

[¶ 50.] The Fourth Amendment to the United States Constitution and Article VI, § 11 of the South Dakota Constitution provide that people have the right to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. It has long been established that the Fourth Amendment prohibits police from entering into a suspect's home to make a felony arrest. *Payton, supra*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586, 100 S.Ct. at 1380. Warrantless arrests and searches, therefore, are unconstitutional unless there is a showing by those who seek exemption from the warrant requirement that their actions fall within a narrowly defined exception. Thus, the State has the burden to prove that the specific search falls into a delineated and limited exception. *See State v. Heumiller*, 317 N.W.2d 126, 128 (S.D. 1982); *State v. Max*, 263 N.W.2d 685, 687 (S.D.1978). Our analysis is also limited to "the facts perceived by the police at the time of the entry, not as subsequently uncovered." *Meyer*, 1998 SD 122 at ¶ 23, 587 N.W.2d at 724 (citing *Heumiller*, 317 N.W.2d at 129).

[¶ 51.] The trial court determined that the second search was permissible in or-

---

emergency circumstances exception and the State did not file a Notice of Review.

der for police to "effectuate a custodial interrogation." The trial court found that the police could enter Lamont's home without a warrant because of the nature of the crime and the potential of Lamont being there.[4] There is no case law that establishes this exception. To "effectuate a custodial interrogation" is, in essence, to effectuate an arrest. To allow such an exception would swallow the rule. A warrant must be procured before the police enter the home of a suspect before an arrest can be permissibly made. While there is no such exception as the "effectuation of custodial interrogation" exception, we will address the State's only argued exceptions in this case: search incident to lawful arrest and hot pursuit.

[¶ 52.] The rationales behind the creation of the search incident to lawful arrest exception are to protect the officers' safety and avoid potential escape by the suspect. *Meyer, supra,* at ¶ 25. Under this exception to the warrant requirement, an officer can search the immediate vicinity of the suspect because a gun or some other weapon may be within his or her reach. *Id.* Likewise, the exception is also warranted because the suspect could also grab something that might lead to his or her escape. *Id.* Therefore, if one of these two reasons is being advanced, the exception applies, and a warrant is not required in making a valid search.

[¶ 53.] The search incident to lawful arrest exception, however, is subject to limitation. It is true that the arrest need not be a condition precedent to the search. *State v. Thunder Horse,* 85 S.D. 76, 177 N.W.2d 19 (1970). We have stated, however, that the search in relation to the arrest cannot be "remote from it either in time or place." *Thunder Horse, supra,* at 82, 177 N.W.2d 19 (citing *Sipera v. State,* 286 Minn. 536, 175 N.W.2d 510 (Minn 1970)). Thus, before such exception can be implicated, the search must be contemporaneous to, or part of a continual transaction to the arrest.

[¶ 54.] Because of the limited scope and application of the exception, I reject the State's argument that the second search was constitutionally permissible under the guise of search incident to lawful arrest. The facts of this case fail to satisfy both the temporal and spatial aspects of the exception. *See New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). As directed by his commanding officer, Officer Rud was to secure the area until a warrant was issued. Officer Rud chose not to wait. Rather, he again entered this room without a warrant and subsequently found Lamont. It is important to note that Lamont was not arrested at that time.[5] Lamont was not arrested until he

---

4. It is important to note that the nature or the severity of the crime is irrelevant to our inquiry. The State argues that because a death is involved, we should disregard Fourth Amendment protections. It is instructive that in *Payton,* the defendants were charged with serious crimes-murder and armed robbery. In *Payton,* the United States Supreme Court denounced the import of the nature of the offense and declined to engage in such a fanciful analysis. In the case at hand, the death was an unintentional homicide at best.

5. There appears to be some discrepancy whether probable cause existed to arrest Lamont prior to their entering his home. Probable cause, however, is not dispositive or probative of whether an exception to the warrant requirement existed. "To be arrested in the home involves not only the invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant [ ] even [ ] when probable cause is clearly established." *Payton,* 445 U.S. at 588–89, 100 S.Ct. 1371. I fail to see how probable cause cures the warrant requirement. Under the majority's holding on this issue, it is obvi-

was brought to the police station over an hour after the search. How could this exception apply when the arrest occurred over an hour after the search and at a wholly different location? Again, the answer is clear. The rationales behind the search incident to lawful arrest exception would eviscerate if we were to allow the search to come before the arrest in this case. Because the search incident to lawful arrest exception does not apply, the search violates the Fourth Amendment.

[¶ 55.] *B. Hot Pursuit*

[¶ 56.] The other ground that the trial court relied on in upholding the second search is hot pursuit. According to the trial court, Lamont was a flight risk and attempting to conceal himself. The court also determined that the officers were in hot pursuit.

[¶ 57.] The officers' initial appearance at the Horseshoe Motel was to investigate an unrelated matter. It was pure happenstance that led to their investigation of Lamont.[6] The United States Supreme

Court, in reviewing the "hot pursuit" exigency justifying a warrantless entry, has defined the circumstance as one where there is an "immediate or continuous pursuit of [a suspect] from the scene of a crime." *Welsh*, 466 U.S. at 753, 104 S.Ct. at 2099. In *Commonwealth v. Talbert*, 23 Va.App. 552, 478 S.E.2d 331, 334 (1996), the court explained that "[a] pursuit is 'hot' if the circumstances are such that breaking off or delaying the chase for the time required to obtain a warrant is likely to involve significant danger to any person, loss of evidence or opportunity for the suspect to escape." Such circumstances encompassed within the meaning of "hot pursuit" do not exist in the case before us. To conclude that the officers were in hot pursuit even though they never saw him, did not know for sure he was the driver of the vehicle, and did not know he was in the room at the time of entry is clearly erroneous.

[¶ 58.] These findings, under either the clearly erroneous or de novo standard, cannot be upheld.[7] At the time of entry,

ous that a South Dakota resident cannot retreat into his or her home without being subjected to arbitrary governmental intrusion, even though the officers were directed to only secure the area.

**6.** Black's Law Dictionary defines pursuit: the act of chasing to overtake or apprehend. Black's Law Dictionary 1250 (7th ed. 1999). As mentioned before, the officers were called to the Horseshoe Motel on an unrelated matter; the driver of the vehicle in question was unknown at the time; and Lamont's room was found unoccupied after the first illegal search. To say that these officers were in hot pursuit would all but eviscerate the general rule prohibiting searches in violation of the Fourth Amendment.

**7.** The majority relies on *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) and *State v. Storvick*, 428 N.W.2d 55 (Minn.1988) for upholding a search on an exception the State never presented evidence

on or argued to the trial court. The majority now creates after-the-fact "exigent circumstances" the police officers never thought existed. Moreover, the cases relied upon by the majority are factually dissimilar to the case at hand. *Welsh* dealt with a misdemeanor traffic offense where the United States Supreme Court held that a warrantless intrusion into defendant's dwelling was unreasonable under the Fourth Amendment. Here, we have what the majority considers a "more serious crime." It is important to note that *Payton*, which was not overruled by *Welsh*, involved murder and armed robbery. Despite the "serious" nature of those crimes, the *Payton* court held that a warrantless search of defendant's home violated the Fourth Amendment. While the majority relies on certain excerpts of dicta in *Welsh*, Fourth Amendment protection should not depend on the gravity of the offense, as illustrated in *Payton*. As the *Welsh* court stated, "no exigency is created simply because there is probable cause to believe that a serious crime has been committed."

the officers did not know that Lamont was the driver of the vehicle that was involved in the accident. It was only after their entry did they find out Lamont was involved in the accident. As we have previously stated, we must review the fact known to the officers "at the time of the entry, not as subsequently discovered." *Meyer, supra,* at ¶ 23. Since the two searches were constitutionally impermissible, all evidence seized and statements made that were not freely given should also be suppressed. The statements made by Lamont and the testimony by the officers of what they observed inside Lamont's home should be inadmissible as "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In order to avoid such a result, it is incumbent upon the State to show that the evidence was not the product of the illegal search. *Wong Sun, supra* at 483, 83 S.Ct. 407. Thus, the State must prove that the statements made by Lamont or the testimony of the officers describing Lamont's motel room did not come "by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.*

[¶ 59.] Here, the statements made by Lamont and the officers' observations of Lamont's motel room are a direct and natural consequence of the illegal search. It does not matter that Lamont received *Miranda* warnings as the warnings can only cure a Fifth Amendment defect. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Cf. State v. Habbena,* 372 N.W.2d 450 (S.D.1985)

---

466 U.S. at 753, 104 S.Ct. 2091, 2099, 80 L.Ed.2d 732.

Moreover, the factual scenario surrounding the second search of Lamont's home is distinguishable from *Storvick.* In this case, police had specific directions from their commanding officer to secure the area and wait for a search warrant. The majority claims that lights being turned off and the door being locked so changed the circumstances that the police had to act quickly. The majority, however, fails to mention that Lamont's vehicle had already been towed, therefore, giving Lamont little access for escape. It should also be pointed out that this was Lamont's permanent home. With no means to flee and no place to find refuge only support the position that the police should have waited for a warrant. Another distinction from *Storvick* is that in this case no testimony was presented to the trial court that police were concerned about dissipation of Lamont's blood alcohol level. At the suppression hearing both responding officers testified that their sole reason for entering Lamont's home without a warrant is to see if anyone was in need of medical attention. For reasons discussed earlier, the trial court rejected this ground. The majority's dismissal of these facts defeat any analogous comparison to *Storvick.* The *Stor-*

vick court stated that the officers "needed to act as quickly as possible to precisely ascertain defendant's blood alcohol level before the evidence dissipated ... and that our decision is a limited one based on the facts of this case." 428 N.W.2d at 61. This is not a case of "limited" circumstances where this Court should follow *Storvick,* as the initial blood test in this case is not in dispute, as no evidence was presented as to the dissipation of blood alcohol levels, and as the trial court never ruled in such a manner. We do, however, agree with the majority's citation to *Storvick* to the extent that "the expectation of privacy that one has in one's residence is the core expectation or interest protected by the Fourth Amendment and we are and will be hesitant in finding exigent circumstances for warrantless entries of dwellings." 428 N.W.2d at 61. As recently as last term, the United States Supreme Court, per Justice Scalia, wrote in invalidating a search as unconstitutional: "At the very core of the Fourth Amendment stands the right of man to retreat into his own home and be free from unreasonable governmental intrusion." *Kyllo v. United States,* — U.S. —, —, 121 S.Ct. 2038, 2041, 150 L.Ed.2d 94, —, . Lamont's core expectation of privacy is worthy of Fourth Amendment protection no matter what we might think of him personally.

(holding that a subsequently issued search warrant was an independent source thus, the exclusionary rule did not apply). Because the State has failed to prove that Lamont's statements or the officers' observations were procured from an independent source or some other non-illegal causal connection, all statements made by Lamont and the officers' observations of Lamont's home are to be suppressed. *See Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1987). Since the evidence used against Lamont was not obtained through an "independent source," the exclusionary rules applies as the State failed to prove that its investigation to be "sufficiently [ ] purged of the primary taint." *Wong Sun, supra.*

### Issue 3. Second Blood Draw

[¶ 60.] The trial court held that the two separate blood samples taken from Lamont were permissible under the search incident to lawful arrest exception to the warrant requirement.

[¶ 61.] Both parties agree that Lamont did not consent to the blood tests. Thus our review of a non-consensual search is subject to traditional Fourth Amendment analysis. *Meyer,* 1998 SD 122 at ¶ 24, 587 N.W.2d at 724; *State v. Benallie,* 1997 SD 118, ¶ 11, 570 N.W.2d 236, 238. Meaning, we review the propriety of the search of Lamont's blood as a question of law, subject to de novo review. *Hirning, supra* at ¶ 9.

[¶ 62.] We have long held that a blood test may be required as a search incident to lawful arrest following certain types of felony arrests. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *see also South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). Where a showing had been made that the substance searched for is of the character that may quickly dissipate a warrant is not required. *See State v. Buchholz,* 1999 SD 110, 598 N.W.2d 899; *State v. Hanson,* 1999 SD 9, 588 N.W.2d 885. The detection of incriminating evidence, for Fourth Amendment purposes, permits such intrusion.

[¶ 63.] Our cases have not allowed continued permission for police to conduct multiple blood tests for the purposes of extrapolation only. Allowing one test is reasonable under the Fourth Amendment if it can be shown necessary for the gathering evidence which may quickly dissipate. Any more than the initial intrusion, however, must be justified on independent grounds. *Almond,* 511 N.W.2d at 575 (holding that while there was probable cause to detain defendant, there was no further independent justification to search defendant). Because an independent ground has not been identified by the State, there is no authority for a second, third or fourth, etc. blood sample. *Id.*

[¶ 64.] This Court has always allowed the extrapolation to be introduced to opine as to the blood alcohol level at the time of the stop or whenever. *State v. McDonald,* 421 N.W.2d 492 (S.D.1988); *State v. Fode,* 452 N.W.2d 779 (S.D.1990). Here, the police wanted a second sample of Lamont's blood for no other reason than to strengthen its case.[8] While the temporal aspect of

---

**8.** It is important to note that the police did not rely on the search incident to lawful arrest exception. Simply put, there is no authority allowing a second test. Our review of the South Dakota Codified Laws allows "the" "withdrawal" or "chemical analysis" of blood for determining a DUI offense. See SDCL §§ 32–23–1 et seq. The statutes that implicate blood draws are written in the singular as evidenced by the use of the article "the" coupled with the singular use of the noun. The State, nor can the majority, point to any statute, which allows for the taking of multiple tests or samples. As such, we will not

this case only involves an hour's time, it is important to remember that it is the justification and underlying rationale for allowing blood tests that governs Fourth Amendment analysis. The "reasonableness" of the intrusion is examined only after the requisite legal justification for the initial intrusion itself is satisfied. *United States v. United States Dist. Court for Eastern Dist. of Mich.*, 407 U.S. 297, 315–18, 92 S.Ct. 2125, 2136–37, 32 L.Ed.2d 752 (1972) ("Though the Fourth Amendment speaks broadly of 'unreasonable searches and seizures,' the definition of 'reasonableness' turns, at least in part, on the more specific commands of the warrant clause"). The prosecution through one blood test could prove the element of "legal drunkenness." A second test is not necessary.

[¶ 65.] Therefore, I respectfully dissent.

condone such a practice not authorized by statute.