#23296-aff in pt, rev in pt & rem-JKM

**2006 SD 43**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

JESSIE KREBS,                             Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE THOMAS L. TRIMBLE
HONORABLE MERTON B. TICE, JR.
Judge

* * * *

LAWRENCE E. LONG
Attorney General

ANN C. MEYER
Assistant Attorney General          Attorneys for plaintiff
Pierre, South Dakota                and appellee.

TIMOTHY J. RENSCH of
Rensch Law Office                   Attorney for defendant
Rapid City, South Dakota            and appellant.

* * * *

ARGUED ON OCTOBER 4, 2005

OPINION FILED **04/26/06**

MEIERHENRY, Justice

[¶1.]        Sixteen year-old Jessie Krebs appeals his conviction for first-degree manslaughter.  We affirm in part, reverse in part, and remand for trial.

## FACTUAL AND PROCEDURAL BACKGROUND

[¶2.]        Jessie Krebs (Krebs) was charged with murder and manslaughter in the stabbing death of Chance Darrow (Darrow).  The charges stem from an incident involving a fight during the early morning hours of July 12, 2003.  Events leading up to the incident started on the prior evening of July 11, 2003.  After getting off work from his construction job, Krebs met several of his friends to socialize.  The group of friends spent most of the evening and early morning hours driving around the area from Box Elder to Rapid City, South Dakota.  The group returned to Krebs's apartment in Box Elder after 2:00 a.m.  Around 3:00 a.m., Krebs along with two male friends, his girlfriend, and his female cousin headed for Rapid City in Krebs's vehicle.  The purpose of the trip was to meet a girl named Rianna who was planning to fight another girl named Angelique.  The group knew Angelique was hosting a keg party at her residence in Rapid City.  Angelique's party started around 10:00 p.m. in a large open field behind her trailer.  A bonfire marked the site of the party.  After meeting in a Rapid City parking lot, Krebs's group followed Rianna and three of her friends to the party site.

[¶3.]        When they arrived, Rianna and her girlfriends headed for the bonfire.  Krebs and his two male companions also headed for the bonfire, while his girlfriend and cousin waited in the vehicle.  Almost immediately, Rianna confronted

Angelique and the two began to fight. Eventually, fighting erupted between Krebs's group and the partygoers.

[¶4.] During the melee, Krebs and Darrow began to fight. The two exchanged blows. At some point Krebs stabbed Darrow with Krebs's double-edged, fixed-blade knife that Krebs had brought with him. Krebs and his two male companions fled the scene. Darrow died a short time later en route to the hospital.

[¶5.] Krebs was charged with alternative counts of second-degree murder and first-degree manslaughter. He moved to transfer the charges to juvenile court. The trial court denied the motion and Krebs was tried as an adult. At trial, Krebs sought to establish a claim of self defense. The jury acquitted Krebs of the murder charge but convicted him of first-degree manslaughter. He was sentenced to twenty years in the South Dakota State Penitentiary. Krebs appeals his conviction and raises the following issues:

## ISSUES

1. Whether the trial court erred in refusing to transfer Krebs to juvenile court.

2. Whether the trial court erred by allowing the State to present undisclosed inculpatory testimony in violation of a pretrial discovery order.

3. Whether the trial court erred by allowing the State to introduce a video tape showing Darrow's distraught girlfriend and Darrow's body being removed from her vehicle.

## DECISION

*Transfer to Juvenile Court*

[¶6.] Krebs contends that it was error for the trial court not to transfer the case to juvenile court. Krebs was 16 years old at the time of the incident, and he

#23296

was charged with second-degree murder, a Class B felony, and first-degree

manslaughter, a Class 1 felony. South Dakota law requires that a child charged

with Class B and Class 1 felonies be tried in circuit court as an adult. SDCL 26-11-

3.1. The law allows the child to request a transfer hearing "to determine if it is in

the best interest of the public that the child be tried in circuit court as an adult."

*Id.* If the child is sixteen years of age or older, "there is a rebuttable presumption

that it is in the best interest of the public that [the] child . . . be tried as an adult."

*Id.* The statutory factors for the court to consider are as follows:

> (1)    The seriousness of the alleged felony offense to the
>         community and whether protection of the community
>         requires waiver;
> (2)    Whether the alleged felony offense was committed in an
>         aggressive, violent, premeditated, or willful manner;
> (3)    Whether the alleged felony offense was against persons or
>         property with greater weight being given to offenses
>         against persons;
> (4)    The prosecutive merit of the complaint. The state is not
>         required to establish probable cause to show prosecutive
>         merit;
> (5)    The desirability of trial and disposition of the entire
>         felony offense in one proceeding if the child's associates in
>         the alleged felony offense are adults;
> (6)    The record and previous history of the juvenile;
> (7)    The prospect for adequate protection of the public and the
>         likelihood of reasonable rehabilitation of the juvenile, if
>         the juvenile is found to have committed the alleged felony
>         offense, by the use of procedures, services, and facilities
>         currently available to the juvenile court.

SDCL 26-11-4.

[¶7.]        If the court determines that the child should be tried as an adult in

circuit court, the court is required to enter an order and findings of fact. *Id.* The

trial court's findings "may not be set aside upon review unless clearly erroneous,

and due regard shall be given to the opportunity of the trial court to judge the

credibility of the witnesses." *Id.* As to the seven factors in SDCL 26-11-4, we have stated: "'It is not necessary that evidence be presented on all of these factors at each transfer hearing, or that the trial court must make express findings on each factor.'" State v. Milk, 519 NW2d 313, 318 (SD 1994) (citations omitted). In addition, "[c]ontrolling weight is not given to any one factor, and the court is not 'confined to a consideration of only the listed factors to the exclusion of others.'" *Id.* (citation omitted).

[¶8.] Consequently, our initial task is to review the findings of fact of the trial court.[1] In its findings, the trial court considered the statutory factors in light of the transfer hearing evidence. Applying the factors, the court found that the alleged offense was (1) "an extremely serious . . . felony offense," (2) "committed in an aggressive, violent and premeditated manner," (3) "was against a person," as opposed to property, and (4) had prosecutive merit. Factor (5) did not apply since the disposition did not involve associates. Factor (6) was favorable to Krebs since he had "no prior criminal record or previous history as a juvenile." The trial court specifically pointed out that "Krebs voluntarily brought a knife to a situation where he expected conflict and therefore expected that someone could be killed by his action." "[I]f you take a knife . . . to a place where you expect conflict," the court pondered, "then you expect to possibly have to use that knife." The court entered a written finding that "the evidence indicates a deliberate intent to take a weapon to

---

1. The trial court made both oral and written findings.

a fight under circumstances where [Krebs] anticipated conflict; further, the victim in this case suffered five stab wounds."

[¶9.]    As to factor (7), the trial court initially determined that the system had "sufficient resources for the likely reasonable rehabilitation of the juvenile." Nevertheless, the trial court found that the prospect for adequate public protection if Krebs were convicted was small because of the lack of procedures, services, and facilities available in the juvenile system. Based on these findings, the court determined that it was not in the best interests of the public for Krebs to be tried in juvenile court.

[¶10.]    Krebs claims that the trial court's findings are clearly erroneous. Specifically, Krebs asserts that two of the findings contradict each other. In one finding, the court determined that the juvenile system had resources to rehabilitate Krebs. In a following finding, the court determined that the juvenile procedures, services, and facilities could not adequately protect the public from Krebs. If he can be rehabilitated, Krebs argues, the public is protected. Krebs also claims that there was insufficient proof of an aggressive, violent, or premeditated act or that carrying a knife to a fight constitutes knowledge that someone could be killed.

[¶11.]    Much of the evidence upon which the trial court based its findings was undisputed. The evidence revealed that Krebs and his friends went to a party anticipating a fight between two girls. One of the girls was a friend of Krebs's group. Krebs took his knife with him to the party. The anticipated fight between the girls ensued. Fighting then broke out between members of Krebs's group and the group at the party. During the fight, Krebs ended up in a struggle with Darrow

and stabbed Darrow. There was no evidence that Darrow had been armed. The coroner testified that Darrow suffered five stab wounds and died as the result of a stab wound to the abdomen which perforated the abdominal artery. The coroner also testified that Darrow's lethal stab wound matched the knife recovered from the roof of Krebs's apartment building.

[¶12.] Based on these undisputed facts, the court was justified in finding that the offense was a serious felony. Even assuming that premeditation was not supported by the evidence as Krebs claims, the evidence supported a finding that a serious, violent crime against a person resulting in a death had occurred. The statute does not require that the court make a finding of premeditation. The statute only requires the court to consider "[w]hether the alleged felony offense was committed in an aggressive, violent, premeditated, *or* willful manner." SDCL 26-11-4(2) (emphasis added). Because the statute lists the factors in the disjunctive, the manner of the crime can be aggressive, violent, premeditated, or willful. Although the court found all four, any one or more of the four factors would have sufficed. We cannot say that this finding is clearly erroneous.

[¶13.] Krebs argues that the court's findings regarding rehabilitation prospects and protecting the public were contradictory. The circuit court was convinced by the evidence that Krebs could be rehabilitated but still found that the juvenile system could not protect the public. Although this may seem contradictory, it is not. The two factors for the court to consider involve two separate concepts. One factor is the likelihood of reasonable rehabilitation of the child in the juvenile system. The other factor is whether the juvenile system, as established, can protect

the public.  The rehabilitation factor requires only a likelihood that the child can be

rehabilitated.  Even though a penal system contemplates rehabilitation, it must

also establish safeguards for the consequences that may result when it fails to

rehabilitate.  Thus, a correctional facility establishes rehabilitation programs but

still maintains secure facilities for the protection of the public.  The judge

determined that those safeguards were lacking in the juvenile system.  One of the

judge's concerns was that the juvenile system would lose jurisdiction of Krebs when

he reached the age of 21.  The judge expressed concern regarding whether the

juvenile system could deal with "what was going on" with Krebs within that time

period.  The judge said to the parties at the end of the hearing:

> There is nothing in [Krebs's] character that supports the purpose to take a life or to cause injury to other people.  This raises a conflict for me.
>
> The question is what is in the best interest of society.  And I know that we lose jurisdiction on this case when you reach 21.  And I'm not satisfied we know fully what's going on or how this occurred.
>
> Were this act not committed, I'd expect you to run for president or have every other opportunity to be a very positive, contributing member of our community.  And I don't think anybody here would question your character or your personality or your abilities.
>
> But this act flies in the face of that and leaves me with a concern about your future potential assuming the scenario that I've shared stands unaddressed.
>
> And while I believe the juvenile system has resources, I don't know that I can say with sufficient satisfaction that the State—that the defendant has overcome the burden . . . .

The trial court was not clearly erroneous in its determination.  The evidence before

him depicted, on the one hand, a young man with a lot of potential who would

-7-

probably do very well in the juvenile system. On the other hand, the judge saw the violence of which the young man was capable. These diametrically opposed characteristics convinced the judge of the need for rehabilitative services beyond the age of 21.

[¶14.] Additionally, the trial court's inquiry recognized the rebuttable presumption created by the Legislature. Under the law it is presumed that it is in the public's best interest to try Krebs as an adult. Consequently, transfer was proper only if evidence rebutted that presumption and indicated that it was in the public's interest to transfer jurisdiction to juvenile court *and* if doing so would be in Krebs's best interest. This Court has stated that even where it is in the juvenile's best interest to be tried as a juvenile, "that is not the only criteria to be considered." *In re* S.K., 1999 SD 7, ¶39, 587 NW2d 740, 746. Rather, the interests of the public govern, and it must be in both the interests of the child and the public for the child to be tried as a juvenile. *Id.* The trial court determined that the presumption had not been rebutted. We cannot say that the trial court's findings were clearly erroneous or that his decision not to transfer Krebs to juvenile court was an abuse of discretion.

*State's Untimely Disclosure of Inculpatory Evidence*

[¶15.] Prior to Krebs's trial, the court imposed a deadline by which the state was to disclose "[a]ll statements considered by the prosecution to be relevant to the alleged crime made by any person which would tend to incriminate or exculpate [Krebs], whether reduced to writing or not." On the third day of trial, the State called a female witness to the stand. The State had not disclosed the witness as

possessing inculpatory evidence, and the State did not indicate the full nature of her testimony in its opening statement. The witness testified that Krebs and his two male friends came to her house around 5:00 p.m. on Saturday, July 12, the afternoon of the stabbing, and stayed until the next morning. While they were there, the witness claimed she observed one friend hit Krebs in the face, arms, and legs in ways that "looked like it hurt." She also testified that the boys were purposely scratching themselves and each other on their arms and stomachs. According to the witness, Krebs jokingly stated that "he killed before and he'd kill again." She also testified that on Sunday morning, July 13, she saw the trio laughing and bumping knuckles as they read newspapers.

[¶16.] When she was first interviewed by authorities, the witness did not inform them of her observations because "they didn't ask" and she did not think her observations were important. To the witness, "it just seemed like they were being teenage boys and fighting and hitting each other and wrestling around." She testified that she did not tell anyone, including law enforcement, of her observations until she told the State's attorney during trial preparation the weekend before the trial started.

[¶17.] After her testimony, Krebs moved for a mistrial. He argued that the evidence violated the discovery order requiring the State to notify the defense of all inculpatory statements. The State's attorney admitted that the information was discovered the weekend before trial and had not been disclosed. He argued, however, that the information was work product and not subject to the discovery order. The trial court denied Krebs's motion for a mistrial. The court found that

the State did not violate the discovery order by failing to notify Krebs upon discovery of the inculpatory evidence. Because he determined that no violation occurred, the trial court imposed no sanctions or remedial measures. *See* SDCL 23A-13-17 (Rule 16(d)(2)).[2]

[¶18.] At oral argument in this appeal, the State conceded that the Pennington County State's Attorney violated the discovery order by failing to provide inculpatory evidence and that the undisclosed evidence was not protected by the work product doctrine. Regardless of the discovery order violation, however, the State claims that Krebs suffered no prejudice. Krebs, on the other hand, contends that he was prejudiced. He claims that without knowledge of the incriminating nature of the testimony, he was unable to prepare countering evidence or to present opposing expert testimony that his injuries were not self-inflicted.

[¶19.] At trial, Krebs moved for a mistrial immediately after the testimony was presented. When a party makes such a motion, "[t]he decision to grant or deny

---

2. Under Rule 16(d)(2) of the Rules of Criminal Procedure,

> If, at any time during the course of a proceeding, it is brought to the attention of a court that a party has failed to comply with an applicable discovery provision, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place, and manner of making the discovery and inspection and may prescribe such terms and conditions as are just.

SDCL 23A-13-17.

a mistrial must be based on the prejudicial effect of the witness'[s] statement," and "'[p]rejudicial error' is error which in all probability must have produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." State v. Michalek, 407 NW2d 815, 818-19 (SD 1987) (citations omitted). Similarly, when a discovery order is violated, the inquiry is whether the defendant suffered any material prejudice as a result of the late disclosure. State v. Archambeau, 333 NW2d 807, 810-11 (SD 1983). We have established that "[a]lthough a trial court's order for the production of evidence must be expeditiously carried out and obeyed, not every failure to produce evidence as ordered is, without more, prejudicial error." Id. at 811. "[I]mplicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." Marshall v. State, 305 NW2d 838, 843 (SD 1981) (citation omitted). We recently reiterated our standard of review:

> We presume the evidentiary rulings made by a trial court are correct, and review those rulings under an abuse of discretion standard. The test for abuse of discretion "is not whether we would have made the same ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." If error is found, it must be prejudicial in nature before this Court will overturn the trial court's evidentiary ruling. "Error is prejudicial when, in all probability . . . it produced some effect upon the final result and affected rights of the party assigning it."

State v. Mattson, 2005 SD 71, ¶13, 698 NW2d 538, 544 (citations omitted). Thus, our standard of review for the violation of a discovery order mirrors the standard applied when reviewing both mistrial motions and evidentiary issues.

[¶20.] In order to determine whether Krebs was prejudiced by the undisclosed evidence, we examine the nature of the testimony and its effect on the

-11-

jury. The evidence was highly relevant to Krebs's self defense theory. Since Krebs admitted stabbing Darrow, his only defense was that he had done so to meet Darrow's aggressive actions against him during the fight. Thus, the main issue for the jury was whether Krebs was acting in self defense. The State presented the undisclosed testimony to dispute Krebs's claim. The witness's testimony was the only testimony suggesting that Krebs's injuries were self-inflicted and conflicting directly with other testimony describing Krebs's injuries and demeanor. The defense had no notice of the inculpatory nature of this witness's testimony prior to the time she testified at trial. On cross examination, the witness said that she had not told anyone—not even the police—this version of her observations until she informed the State's attorney while preparing her testimony the weekend before trial. The State's attorney learned of the inculpatory evidence at least four days before the witness testified, yet he did not inform the defense or the court.[3]

[¶21.] The testimonial evidence was not only inculpatory, it completely undercut Krebs's defense. This fact distinguishes *State v. Moran* where we found that a discovery order violation was adequately remedied, even though undisclosed DNA evidence was admitted at trial, 2003 SD 14, ¶¶17-24, 657 NW2d 319, 324-26. There, the DNA evidence was not central to the defense that the victim consented to sexual intercourse, and therefore "it would have been futile for [the defendant] to hire his own DNA expert." *Id.* ¶23, 657 NW2d at 326. In this case, simply offering the testimony of Krebs and his two male friends, whose biases were specifically

---

3. The witness testified on the third day of the five day trial.

argued by the State,[4] was not enough to cure the prejudice that resulted from the late disclosure. Nor was it within the expertise of the jury to be able to view the photos of Krebs, taken shortly after his arrest, and determine for themselves whether his wounds were self-inflicted. Had Krebs expected the introduction of such evidence, he could have taken further action to counter its damaging effect.

[¶22.] The probability of the effect of the testimony upon the jury is, in part, evidenced by its prominence in the State's final argument. In final argument, the State's attorney included this statement concerning the witness's testimony:

> [The witness] testified she doesn't know Chance Darrow . . . or anybody else associated with [Darrow]. She also testified that until that day she didn't know [Krebs]. She thought they were being idiots, smacking each other around and scratching each other. She didn't know. What did that mean? They were enhancing their injuries because they know their story about self defense is bogus.

Further, in the penultimate paragraph of its rebuttal, the State asserted the following:

> I submit to you that [the witness's] credibility is enhanced by the fact that not only were [Krebs and his friends] bumping knuckles, they admitted to that, because there was no way around it.

The State's attorney considered the persuasiveness of the testimony to be of such importance that he mentioned it twice in his final argument. Almost as its final

---

4.    In its closing argument, the State argued "there was no self-defense here, and [Krebs] knows it. And [Krebs and his friends Steve and Brian] all knew it . . . . [Steve's] best friend was on trial for murder. [Brian's] friend was on trial for murder. Jessie Krebs is on trial for murder. Who has the most to lose; who has the most to gain?"

word to the jury, the State argued that the witness's testimony was more believable than the testimony of Krebs and his friends.

[¶23.] As we have noted, "[d]iscovery statutes exist to eliminate trial by ambush." State v. Sorenson, 2000 SD 127, ¶9, 617 NW2d 146, 148 (citation omitted). Yet an ambush is exactly what occurred here, where "the [S]tate was anything but conscientious and candid."[5] State v. Sahlie, 90 SD 682, 688, 245 NW2d 476, 479 (1976). The failure to disclose the inculpatory testimony materially prejudiced Krebs's defense and constitutes reversible error. Therefore, we remand for a new trial.

*Video Tape Evidence—Probative Value verses Prejudicial Effect*

[¶24.] Krebs also claims that the trial court erred in admitting a videotape. The video came from the camera mounted on the dashboard of the responding officer's vehicle. On his way to the scene, the officer encountered a car driven by Darrow's girlfriend which carried Darrow and his friend Michael. The video captures the stop and the emotional interactions between the officer, Darrow's

---

5.     This witness's testimony is not the only evidence which the State failed to disclose in violation of the trial court's orders. The State did not produce the video from the police car's dashboard camera until approximately one week before trial. Further, not until after the jury was selected did Krebs receive a police report referring to a witness who, at some time during the party, was injured in a fight. Finally, on the second day of trial, the State produced a videotaped interview of Michael Wisely, one of the State's witnesses and a friend of Darrow. As to the dashboard tape, Krebs's motion in limine to exclude was denied, and that issue on appeal is considered herein. *See infra* ¶¶24-27. Krebs also made several motions for mistrial based on the other late productions by the State, but those motions were also denied. While Krebs did not raise these issues on appeal, it shows a dilatory pattern by the State's attorney which the defendant had to deal with throughout the proceedings.

girlfriend, Darrow's friend Michael, and a second responding officer. For a short time, Darrow can be seen in the background of the video through the back window of the car; he then slumps from view. The video next shows the arrival of emergency personnel and their removal of Darrow's body from the car. Finally, the video shows the officer's short trip down Melody Lane to the site of the party and his entry into the driveway.

[¶25.]    Although the State produced the video after the discovery deadline, Krebs did not claim that he was prejudiced by its untimely production. Rather, Krebs moved to exclude the tape because it was not relevant and highly prejudicial. Despite our remand for a new trial, we address the admissibility of the videotape because of the likelihood that the issue may arise again on remand.

[¶26.]    We review evidentiary rulings of the trial court under an abuse of discretion standard. We have said,

> "For us to disturb the evidentiary rulings of the circuit court, we must determine that an abuse of discretion has occurred. . . . [A]n abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence."

State v. Moriarty, 501 NW2d 352, 355 (SD 1993) (citation omitted). In this case, the trial court did not initially admit the video because it was not relevant and its prejudicial effect outweighed its probative value. The State persisted and then offered the tape without the sound to show "the passenger getting out of the vehicle" and to show "the crime scene and the darkness of the area as the vehicle is traveling down that road." After viewing the tape with counsel without the sound, the judge allowed the tape to come in "to show what occurred at that particular time." The

judge stated that removing the sound "takes away at least enough of the prejudice that it makes it probative enough for the State to use in their case in chief, to show what occurred at that particular time, and I am going to allow it for that purpose."

[¶27.] Although the trial court's ruling on relevancy is somewhat vague, we cannot say the admission of the video was an abuse of discretion. Because the sound was removed, the court was satisfied that the tape's prejudicial effect was adequately reduced. The trial court found that the probative value of the scene depicted on the tape outweighed its prejudicial impact and that it should be presented to the jury. Under our standard of review, we cannot say that the trial court abused its discretion.

[¶28.] Krebs also raised the issue of whether the trial court erroneously allowed the admission of prior bad acts evidence under SDCL 19-12-5 (Rule 404(b)) without prior notice from the State. Because we reverse for a new trial, we need not reach this issue.

[¶29.] We affirm the trial court's decision to transfer Krebs to circuit court. Because of the prejudicial admission of undisclosed inculpatory evidence, however, we reverse and remand for a new trial.

[¶30.] GILBERTSON, Chief Justice, and SABERS, Justice, concur.

[¶31.] KONENKAMP and ZINTER, Justices, concur in part and concur in result in part.

ZINTER, Justice (concurring in part and concurring in result in part).

[¶32.] I concur on all issues except issue three. On issue three, I concur in result because admitting the video tape simply "to show what occurred at that particular time," did not establish relevance. Nevertheless, the video tape was relevant to support the reliability of two witnesses whose testimony refuted Krebs's claim of self-defense. Therefore, it was admissible.

[¶33.] "It is well settled that photograph[ic images] are generally admissible where they accurately portray anything that a witness may describe in words. They are also admissible when they are helpful in clarifying a verbal description of objects and conditions. They must, however, be relevant to some material issue." State v. Owens, 2002 SD 42, ¶89, 643 NW2d 735, 756-57 (citing State v. Holland, 346 NW2d 302, 307). In this case, Krebs relied on a claim of self-defense. "When a defendant raises the affirmative defense of self-defense, it is incumbent upon the State to prove beyond a reasonable doubt that the killing was without authority of law." State v. Knecht, 1997 SD 53, ¶10, 563 NW2d 413, 418 (quoting State v. Burtzlaff, 493 NW2d 1, 7 (1992) (citations omitted)). This burden of persuasion made evidence disproving self-defense relevant.

[¶34.] As the Court notes, Judge Trimble initially allowed the video tape into evidence "to show what [was occurring] at that particular time." *Supra* ¶26. But additionally, in the pretrial ruling on admissibility, Judge Trimble also noted that it was possible the video could be used for other purposes at trial, such as determining credibility or impeaching a witness. As it turned out, he was precisely correct. The

State used the video to establish the reliability of statements made by two witnesses who refuted Krebs's claim of self-defense.

[¶35.] The State introduced the video tape during the testimony of Deputy Sheriff Mark Osborne. Osborne was one of the responding officers that stopped the car transporting Darrow to the hospital immediately after the stabbing. During this stage of the incident, Osborne observed two witnesses make statements regarding what had occurred. Osborne first observed Darrow's girlfriend (C.H.), who had been at the scene when the stabbing occurred, state that two males rushed the victim (Darrow) to fight him. This statement was contrary to Kreb's claim of self-defense. Krebs, however, contended that C.H.'s statement was biased and untruthful because she was the victim's girlfriend. The video was used to prove that at the time her statement was made, C.H. was crying and in a hysterical state, and therefore, the statement was a reliable excited utterance. As the State argued in its closing statement, C.H.'s physical state, *as depicted on the video*, tended to prove that her comments were made while she was under the excitement of the stabbing; thus, she had no time to reflect on her comments or fabricate untruthful statements. *See* State v. Bult, 351 NW2d 731, 735-36 (SD 1984) (stating "that a person under the sway of excitement precipitated by an external startling event will be bereft of the reflective capacity essential for fabrication and that, consequently, any utterance [s]he makes will be spontaneous and trustworthy"). Thus, the video tape was relevant because it tended to corroborate C.H.'s statement, which tended to prove that Krebs was the aggressor rather than acting in self-defense.

[¶36.]    The video tape was also relevant because it supported Michael Wiseley's testimony. In support of his self-defense claim, Krebs contended that he and his friends were "ambushed" and outnumbered by the individuals who were already at the party, including Wiseley. The State attempted to disprove this contention by establishing that Wiseley and other "ambushing" individuals were not involved in or even close to the fight. In attempting to prove this point, the State called Wiseley, who testified that he was not involved in the fight and that he only saw the very end of the incident when Krebs and his friends were running away.

[¶37.]    The video tape supported Wiseley's testimony because it provided an image of his physical appearance immediately after the fight. The tape displayed that Wiseley's clothes were straight, clean, and not torn and that he had no visual signs of physical injury. From this image, a viewer could infer that Wiseley was not recently involved in a fight. As a result, the video's depiction of Wiseley's physical condition immediately after the fight was relevant to support his testimony that he was not involved in a fight with Krebs.

[¶38.]    In sum, the defense claimed self-defense. To support that theory, the defense attempted to portray C.H. as biased and untruthful and Wiseley as an aggressor. The State had the burden of disproving Krebs's claims. To meet its burden, the State used the video tape to support C.H.'s statement and Wiseley's testimony, both of which tended to disapprove self-defense. For these reasons, the

#23296

video was relevant, and the trial court did not abuse its discretion in admitting it

into evidence.[6]

[¶39.]     KONENKAMP, Justice, joins this special writing.

---

6.     The trial court also ruled that the videotape was not unduly prejudicial. Photographic images "are not rendered inadmissible merely because they incidentally tend to arouse passion or prejudice." *Owens*, 2002 SD 42, ¶89, 643 NW2d at 757 (citations omitted). Rather, it is only evidence that attempts to persuade "in an unfair or illegitimate manner" that is legally, unduly prejudicial. State v. Mattson, 2005 SD 71, ¶20, 698 NW2d 538, 546. In this case, Judge Trimble only allowed the video tape to be played without the audio. A review of the video tape without the audio confirms that it was not unduly prejudicial. It depicts the mental and physical state of two witnesses who were stopped as they were driving the victim to the hospital immediately after the stabbing. Although the video also depicts ambulance personnel removing the victim from the vehicle, there was no request to redact this portion. The remaining portions do not attempt to persuade in an unfair or illegitimate manner.