#24148-a-DG

**2007 SD 99**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

RAYNE RYALL ADAMSON,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
TURNER COUNTY, SOUTH DAKOTA

* * * *

HONORABLE LEE D. ANDERSON
Judge

* * * *

LAWRENCE E. LONG
Attorney General

SHERRI SUNDEM WALD
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
and appellee.

MICHAEL J. BUTLER
Attorney at Law
Sioux Falls, South Dakota                    Attorney for defendant
and appellant.

* * * *

ARGUED APRIL 23, 2007

OPINION FILED **09/26/07**

#24148

GILBERTSON, Chief Justice

[¶1.] On May 3, 2006, Rayne Ryall Adamson (Adamson) was convicted by a jury in the South Dakota First Judicial Circuit, of two counts of witness tampering in violation of SDCL 22-11-19; one count of furnishing alcohol to a minor in violation of SDCL 35-9-1; and one count of furnishing alcohol to a person 18 years of age but less than 21 years of age in violation of SDCL 35-9-1.1. The judgment of conviction was entered on June 8, 2006. We affirm.

## FACTS AND PROCEDURE

[¶2.] On September 9, 2005, a Turner County grand jury indicted Adamson on three counts of third-degree rape in connection with his alleged conduct with a minor, A.M.B., in violation of South Dakota's statutory rape law under SDCL 22-22-1(5); three alternative counts of sexual contact with a child under the age of 16 in violation of SDCL 22-22-7; three counts of witness tampering in connection with alleged conduct involving Rochelle Kjellsen (Kjellsen), A.M.B. and Susan B. (Susan); one count of furnishing alcohol to a minor (A.M.B.); one count of furnishing alcohol to a person 18 years of age but less than 21 years of age (Kjellsen); and one count of violating SDCL 35-10-17 by maintaining a common nuisance as a place used in violation of beverage laws. Prior to trial, the State dismissed two of the statutory rape counts and all three sexual contact counts. The jury trial commenced May 1, 2006. Following the State's case-in-chief, the trial court dismissed the nuisance charge and the witness tampering count with respect to Kjellsen.

[¶3.] The events giving rise to the indictment against Adamson occurred during the summer of 2005. Eighteen-year-old Kjellsen and 14-year-old A.M.B.,

-1-

who lived with her parents and sister, were from Centerville, South Dakota. The two had been friends for several years. During the summer of 2005, A.M.B. was a frequent visitor and overnight guest at the home Kjellsen shared with her boyfriend, Adam Salberg (Salberg). At trial, Kjellsen testified that Adamson was also a frequent guest in their home that summer.

[¶4.]     According to Kjellsen, she, Adamson, A.M.B., and Salberg would often "hang out" and "have drinks together" at the home. Kjellsen indicated that Salberg would either go to The Desert Inn, a Centerville bar owned by Adamson, to pick up drinks to bring back home or that Adamson would deliver them. Kjellsen testified that the drinks consisted of "Bud Light, Busch Light" and that they "had screw drivers brought over a lot."

[¶5.]     Kjellsen indicated that she and Salberg often had bonfires at night in their backyard. On the night of August 5, 2005, while A.M.B. was visiting, Kjellsen and Salberg had a bonfire. Kjellsen testified that A.M.B. used Kjellsen's phone to text-message Adamson to have him bring drinks for them. Kjellsen stated that some time between 11:00 p.m. and midnight, Adamson arrived with three or four "screw drivers and some Bud Lights." Kjellsen said that she "went in the house and put them in the refrigerator." Adamson then returned to work at The Desert Inn. Kjellsen testified that A.M.B. drank the screw drivers. Adamson returned to the bonfire around 2:30 a.m. According to Kjellsen, he brought one more screw driver. He also brought other drinks for himself.

[¶6.]     Kjellsen and Salberg went to bed some time between 3:30 a.m. and 4:30 a.m., leaving A.M.B. and Adamson alone at the bonfire. Kjellsen testified that before going to bed, she told A.M.B. to stay at her house and not to go to Adamson's

house. Adamson's house was located across the street from the home shared by Kjellsen and Salberg.

[¶7.]    Kjellsen stated that sometime between 10:30 a.m. and 11:00 a.m. that morning, she was awakened by someone at their door. Dianna B. (Dianna) testified that she came knocking at Kjellsen's door at that time looking for her younger sister, A.M.B. Dianna left when no one answered the door, but noticed before leaving that A.M.B.'s shoes were not by the door. According to Dianna, A.M.B. would never wear her shoes in Kjellsen's house and would always leave them by the door. Kjellsen testified that after being awakened, she called Adamson's cellular phone and told him to have A.M.B. return to Kjellsen's house. Dianna testified that Kjellsen later told her A.M.B. had stayed at Adamson's house that night.

[¶8.]    Dianna conveyed this revelation to her mother Susan. On the night of August 12, 2005, Susan, accompanied by Dianna, confronted Adamson about whether he had sex with A.M.B. Following this discussion, Susan reported to Centerville Police Chief Nolan Clark (Clark) that the 30-year-old Adamson had had sex with A.M.B. At trial, Susan testified that following her report to Clark, she found A.M.B. and told her "that [she] had heard that [A.M.B.] had had sex with [Adamson] and [that A.M.B.] had to go talk to Nolan [Clark]." She further stated that she told A.M.B. "[t]o tell the truth." Clark testified that following Susan's report, he interviewed A.M.B. and Kjellsen. Clark indicated that Adamson subsequently became the subject of his investigation. Adamson was interviewed by Clark and denied any wrongdoing.

[¶9.]    Kjellsen testified that later, on August 12, 2005, she and Salberg were sitting on their front porch when Adamson stopped by. She said that he asked them

to "lie about him and [A.M.B.]" and to arrange a "staged phone call."[1] Kjellsen stated that she relayed to A.M.B. that Adamson wanted her "to lie about what happened and make a staged phone call."

[¶10.] Clark testified that at about 1:30 a.m. on August 13, 2005, he met with Adamson in the city park at Adamson's request. At that time Adamson told him that "Susan and [A.M.B.] had made the story up" and "that they wanted to retract their statements." Clark stated that after the August 12 and August 13, 2005 meetings, he again was contacted by Adamson who requested that he come to his house. There, Adamson played for Clark a recording that he had made of a conversation between him and A.M.B., in which she claimed she had lied about her conduct with Adamson.[2]

[¶11.] The Turner County Sheriff's Department requested the assistance of South Dakota Division of Criminal Investigation (DCI) Special Agent James Severson (Severson) to investigate Adamson. Severson initially came to Centerville on August 18, 2005, to conference with Clark and review his reports. On August 23,

---

1. The State introduced evidence of numerous telephone calls between numbers registered to Adamson and Kjellsen from the night of August 12 through August 13, 2005. A summary of telephone records from August 5, 2005 through September 9, 2005, was entered into evidence as State's Exhibit 6. The records summarized calling activity for telephone numbers registered to Adamson, Kjellsen, The Dessert Inn, and Susan. From the night of August 12 through August 13, 2005, State's Exhibit 6 lists 22 calls originating from a number registered to Adamson that terminated to Kjellsen's number and 11 calls originating from Kjellsen's number that terminated to numbers registered to Adamson.

2. The recording was entered into evidence as State's Exhibit 7, a DVD-RW on which a copy of the conversation was recorded, and State's Exhibit 8 — Adamson's cellular phone on which the conversation was originally recorded.

2005, Severson returned with two other DCI agents and conducted interviews with A.M.B., Kjellsen and Susan.

[¶12.] At trial, Kjellsen testified that after her August 23, interview with Severson, Adamson called her and asked her to meet him at his house. Adamson then inquired as to the nature of Severson's questions. Kjellsen told him that Severson asked "how many times [Adamson] had sex with [A.M.B.] and where his house was [and] what his bedroom looked like."[3]

[¶13.] Susan testified that between August 23 and September 9, 2005, the day on which the grand jury convened, she had three meetings with Adamson. The two first met on a gravel road outside of Centerville. Susan indicated that she called Adamson and initiated the meeting[4] "[b]ecause [A.M.B.] was changing her story and [he] wanted to know what was going on."[5] Susan stated that when Adamson was informed of this, he too indicated that "it didn't happen." Susan

---

3. Between 5:09 p.m. on August 23 and 9:03 p.m. on August 24, 2005, State's Exhibit 6 lists 10 phone calls originating from a number registered to Adamson and terminating at Kjellsen's number.

4. State's Exhibit 6 indicates that at 5:14 p.m. on September 7, 2005, a call was placed from Susan's home phone that terminated to a number registered to Adamson.

5. State's Exhibit 6 indicates that on September 4, 2005, six telephone calls were placed between a number registered to Adamson and Susan's home phone. At 2:46 a.m. one call was placed from Susan's home phone that terminated at Adamson's number. Between 3:09 a.m. and 3:47 a.m., five calls were placed from Adamson's number that terminated at Susan's home phone. Each of the calls that originated from Adamson's number were made using the *67 feature. This feature is used to block calling name and number identification information on an individual call basis. *Quest Dex Official Directory*, *Sioux Falls*, 33 (August 2007).

testified that Adamson told her she should tell law enforcement that A.M.B. had changed her story and that she should get her an attorney. Susan indicated that she wanted to talk with an attorney before speaking to law enforcement about A.M.B. changing her story.

[¶14.] The second meeting between Adamson and Susan took place at The Desert Inn. Susan testified that she told Adamson she was looking for a lawyer for A.M.B. because she did not want her to get in trouble for changing her statement. Susan indicated that while at The Desert Inn, Adamson assisted her in contacting an attorney for A.M.B. Susan stated that she eventually spoke to Grant Alvine (Alvine), a Sioux Falls, South Dakota attorney, who agreed to represent A.M.B. for a $500.00 retainer.[6] Susan stated that she told Adamson that she did not have $500.00 and asked, "[c]ould he [Adamson] loan me the money?" to which he agreed. Susan testified that Adamson then took $500.00 cash from a lottery machine and gave it to her.[7]

[¶15.] According to Susan, she and A.M.B. met with Alvine on September 8, 2005, the day before the grand jury convened. Susan indicated that following the meeting with Alvine, she met with Adamson in a parking lot in Beresford, South

---

6. State's Exhibit 6 indicates that on the morning of September 8, 2005, three telephone calls, originating from The Desert Inn, terminated at Alvine's office in Sioux Falls.

7. Alvine testified that his records indicated that his office actually received $400 as a retainer.

Dakota. She testified that at that meeting she told Adamson that she had told Alvine "[A.M.B.] was changing her testimony."[8]

[¶16.] Adamson's trial was held on May 1 through May 3, 2006. The jury found Adamson not guilty of third-degree rape, but convicted him on the two remaining witness tampering charges, related to his conduct with A.M.B. and Susan, and on the furnishing alcohol charges involving A.M.B. and Kjellsen.

[¶17.] Adamson appeals raising four issues:

1. Whether the trial court abused its discretion when it denied Adamson's motion to exclude evidence of his cellular phone records.

2. Whether there was sufficient evidence to support the jury's verdict of guilt as to the witness tampering counts and whether the trial court erred by denying Adamson's motion for judgment of acquittal as to the same.

3. Whether there was sufficient evidence to sustain Adamson's conviction for furnishing alcohol to a minor in violation of SDCL 35-9-1.

4. Whether there was sufficient evidence to sustain Adamson's conviction for furnishing alcohol to a person over the age of 18, but less than 21 years of age in violation of SDCL 35-9-1.1.

### STANDARD OF REVIEW

We presume the evidentiary rulings made by a trial court are correct, and review those rulings under an abuse of discretion standard. The test for abuse of discretion "is not whether we would have made the same ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." If error is found, it must be prejudicial

---

8. State's Exhibit 6 indicates that on the night of September 9, 2005, after the grand jury had met, six calls were originated from a cellular telephone registered to A.M.B. that terminated to a number registered to Adamson.

in nature before this Court will overturn the trial courts
[sic] evidentiary ruling.

State v. Mattson, 2005 SD 71, ¶13, 698 NW2d 538, 544 (internal citations omitted).

> The standard of review for denial of a motion for judgment
> of acquittal is whether the "evidence was sufficient to sustain
> the convictions." "When reviewing sufficiency of the evidence,
> this [C]ourt, considers the evidence in a light most favorable
> to the verdict." "A guilty verdict will not be set aside if the
> state's evidence and all favorable inferences that can be drawn
> therefrom support a rational theory of guilt." "'We do not resolve
> conflicts in the evidence, pass on the credibility of the witnesses,
> determine the plausibility of an explanation, or weigh the
> evidence."

State v. Running Bird, 2002 SD 86, ¶19, 649 NW2d 609, 613 (quoting State v.

Verhoef, 2001 SD 58, ¶22, 627 NW2d 437, 442) (internal citations omitted)).

## ANALYSIS AND DECISION

[¶18.]     **1.     Whether the trial court abused its discretion
when it denied Adamson's motion to exclude
evidence of his cellular phone records.**

[¶19.]     Some of the telephone records that were cited by the State in its case-

in-chief were not provided to Adamson until April 24, 2006, one week before trial.

Adamson filed a written motion on April 28, 2006, to exclude call records for his

cellular phone number—605-677-9077.  On May 1, 2006, prior to the

commencement of trial, the trial court heard arguments on this motion.  Adamson

argues that the State was given an unfair advantage when the trial court denied his

motion to exclude his cellular phone records or grant his request for a continuance

in order to review the call records more thoroughly in advance of the trial.  To

substantiate his claim Adamson points to his September 13, 2005 motion for

discovery in which he called for the State to permit him to inspect and copy or

photograph all documents that it intended to use in its case-in-chief as provided under SDCL 23A-13-3.

[¶20.] The duty of a party to a criminal proceeding to act with diligence in disclosing previously requested information is addressed under SDCL 23A-13-15:

> If, prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under §§ 23A-13-1 to 23A-13-14, inclusive, he shall promptly notify the other party or his attorney or the court of the existence of the additional evidence or material.

When a party fails to comply with discovery provisions, the trial court may order that the undisclosed evidence be excluded, that a continuance be granted or it may issue any other order it deems just under the circumstances. SDCL 23A-13-17.

[¶21.] Five months before trial, on December 7, 2005, the State filed its notice of intent to use phone records including those of Adamson, Kjellsen, A.M.B., The Desert Inn, and Susan. Multiple telephone numbers were registered to Adamson either directly or indirectly through The Desert Inn. Adamson concedes that well in advance of trial, the State supplied telephone records that it obtained through subpoena of various telephone service providers.

[¶22.] Reviewing the record reveals that among the 22 subpoenas that the State sent to telephone service providers, one was served upon Western Wireless on September 19, 2005, that commanded it to produce all of Adamson's phone records for 605-677-9077 from July 1, 2005, through the date of the subpoena. Western Wireless informed the State that Adamson's service under 9077 had been terminated and that no records existed for the requested period.

[¶23.]    It was not until April 2006, that the State discovered that Adamson, in 2005, had reactivated 9077 through Verizon Wireless.  The State informed the trial court that it then promptly subpoenaed Verison Wireless for the records and upon receipt, faxed them to Adamson's defense counsel.

[¶24.]    Adamson also argues that his service with Western Wireless was not "terminated," but was merely "transferred" to Verizon Wireless and that the State should thus have been able to provide him the phone records at an earlier date.  This is a distinction without difference.  It was only through diligent review of previously obtained phone records that the State was able to determine that Adamson was continuing to use 9077 and that it might have been reactivated by Verizon Wireless.

[¶25.]    The trial court, in its decision to deny Adamson's motion to exclude, pointed out that as opposed to evidence to which he had no access, the records for 9077 were Adamson's *own records that he had the ability to obtain from his service provider at any time*.  The trial court's ruling further pointed out that the State's notice to Adamson of its intent to use his phone records was served upon him five months before trial.  Finally, we take note of the diligence, exercised by the State, in obtaining the 9077 records and timeliness in which it then provided them to Adamson.  We therefore, conclude that the State satisfied its duty as required under SDCL 23A-13-3.  As such, we find no abuse of discretion by the trial court in denying Adamson's motion to exclude the cellular phone records or order a continuance.

[¶26.]    **2.    Whether there was sufficient evidence to support the jury's verdict of guilt as to the witness tampering counts and whether the trial court erred by denying Adamson's motion for judgment of acquittal as to the same.**

[¶27.]    Adamson claims that there was insufficient evidence to sustain his conviction for either count of witness tampering arguing that the State failed to show that he conferred a benefit on either A.M.B. or Susan with intent to influence them as contemplated under SDCL 22-11-19. Adamson also argues that the State failed to show that he intended to induce either A.M.B. or Susan to testify falsely or withhold evidence.

[¶28.]    South Dakota's law prohibiting witness tampering provides in pertinent part:

> Any person who injures, or threatens to injure, any person or property, or, *with intent to influence a witness, offers, confers, or agrees to confer any benefit on* a witness or prospective witness in an official proceeding to induce the witness to:
>
> (1) Testify falsely; [or]
> (2) Withhold any testimony, [or] information . . .
> . . .
> is guilty of tampering with a witness.

SDCL 22-11-19 (emphasis added). Statutes that prohibit witness tampering are designed to criminalize acts that threaten the veracity and cooperation of witnesses. State v. Peck, 459 NW2d 441, 443 (SD 1990) (citing People v. Moyer, 670 P2d 785, 791 (Colo 1983)). To obtain a conviction, the State is not required to show the defendant succeeded in actually inducing the witness to testify falsely or to withhold information. State v. Charger, 2000 SD 70, ¶34, 611 NW2d 221, 228. "The focus of anti-tampering statutes is on the actions and intent of the person

trying to influence the witness." *Id.* (citing *Peck,* 459 NW2d at 443 (citing State v. Bartilson, 382 NW2d 479, 481 (IowaCtApp1985))).

[¶29.] There is a substantial evidentiary basis for the jury to conclude that Adamson was aware on August 12, 2005, that both A.M.B., as the alleged victim, and Susan, as the complainant, were prospective witnesses to a proceeding arising out of allegations of statutory rape involving him and A.M.B. Kjellsen testified that Adamson, upon learning of the allegations, asked her to convey a message to A.M.B. to lie about the alleged rape and to stage a phone call to that effect. Kjellsen stated that she did then relay the message to A.M.B. *See Charger*, 2000 SD 70, ¶36, 611 NW2d at 228 (holding that in a case where the defendant's coercion of a prospective witness was otherwise demonstrated, an act of witness tampering was complete when a third party, at the defendant's direction, relayed a message to a witness that the witness should not testify against the defendant). Thereafter, A.M.B. did in fact make the phone call which Adamson recorded on his phone and delivered to Clark.

[¶30.] Subsequently, Susan contacted Adamson because A.M.B. had changed her story, to which Adamson told Susan to inform law enforcement and to retain a lawyer for A.M.B. In a second meeting with Adamson at The Desert Inn, Susan requested assistance in finding an attorney for A.M.B., because she was concerned that A.M.B. might get into trouble for changing her story. Susan's testimony, corroborated by phone records that reveal three phone calls at that time, originating from The Desert Inn and terminating at Alvine's office, indicates that Adamson did then help her find an attorney for A.M.B. Significantly, Adamson also conferred a

benefit on both A.M.B. and Susan in the form of a $500.00 cash loan to pay Alvine's retainer. *See Charger* 2000 SD 70, ¶36, 611 NW2d at 228 (citing Navarro v. State, 810 SW2d 432, 437 (TexCtApp 1991) (concluding that the offense of witness tampering was complete when the defendant conferred a money benefit to a witness in a manner calculated to induce false testimony)).

[¶31.]     Based on the aforementioned evidence as provided through the testimony of Kjellsen, Clark and Susan, we conclude Adamson's acts reasonably evince an attempt to induce A.M.B. and Susan to provide false testimony or withhold evidence as to the allegations of statutory rape. Therefore, the jury had sufficient evidence to find that the offense of witness tampering was completed when Adamson assisted Susan in retaining an attorney and conferred a $500.00 loan to pay Alvine's retainer, therein constituting a money benefit to both A.M.B. and Susan.[9]

[¶32.]     The aforementioned evidence alone was enough to constitute a prima facie case of witness tampering; thus justifying the trial court's refusal to grant Adamson's motion for judgment of acquittal. However, the State presented additional evidence that when viewed in a light most favorable to the verdict the jury could have inferred the acts by Adamson were designed to induce A.M.B. and Susan to testify falsely or withhold evidence. Telephone records revealed numerous completed calls between numbers registered to Adamson and numbers registered to

---

9.     Since Alvine testified that his office collected *$400.00* for the retainer, the jury could reasonably infer that Susan kept $100.00 of the $500.00 "loan" for herself.

A.M.B., Kjellsen, and Susan. These records show substantial calling activity on or about August 12, 2005, the date that allegations of statutory rape were leveled against Adamson. The records also indicate significant calling activity on or about August 23, 2005, the day DCI agents came to Centerville and interviewed A.M.B., Kjellsen, and Susan. Finally the records show a considerable amount of calling activity on the days leading up to and including September 9, 2005, the day the grand jury convened.

[¶33.]     As Adamson asserts, it is true that the State presented these records in a manner that did not delve into the identities of the parties to the calls. Further, it cannot be presumed that all of the calls resulted in conversations, due to the brief duration of some of the connections. Nonetheless, the jury could reasonably infer, due to the sheer volume of the connections, that at least some of the calls resulted in conversations between Adamson and A.M.B., Kjellsen, or Susan. From this evidence, together with Susan's testimony as to her final meeting with Adamson in Beresford, arranged so he could be updated following her and A.M.B.'s meeting with Alvine, an inference can be drawn that Adamson was managing an effort to control the nature of evidence that A.M.B. and Susan might provide to law enforcement related to the alleged statutory rape.

[¶34.]     For the foregoing reasons, we conclude that there was both sufficient evidence to support the jury's verdict and no abuse of discretion by the trial court in refusing to grant Adamson's motion for acquittal as to the witness tampering counts involving A.M.B. and Susan.

[¶35.]     **3.     Whether there was sufficient evidence to sustain Adamson's conviction for furnishing alcohol to a minor in violation of SDCL 35-9-1.**

[¶36.] SDCL 35-9-1 provides in pertinent part: "It is a Class 1 misdemeanor to sell or give for use as a beverage any alcoholic beverage to any person under the age of eighteen years. . . ." A.M.B. was 14 years old at all times relevant. Kjellsen testified that both A.M.B. and Adamson were frequent guests, during the summer of 2005, in the home that she and Salberg occupied. Kjellsen also testified that the four would drink at the house and that Adamson would frequently provide the alcohol. Kjellsen further testified that on the night of August 5, 2005, A.M.B. text-messaged Adamson to bring drinks to Kjellsen's and that Adamson complied by bringing screw drivers and beer. Kjellsen then stated that A.M.B. consumed the screw drivers on that occasion. Based on Kjellsen's testimony, we conclude that there was sufficient evidence for the jury to find Adamson guilty of furnishing alcohol to A.M.B. in violation of SDCL 35-9-1.

[¶37.] **4. Whether there was sufficient evidence to sustain Adamson's conviction for furnishing alcohol to a person over the age of 18, but less than 21 years of age in violation of SDCL 35-9-1.1.**

[¶38.] SDCL 35-9-1.1 provides in pertinent part:

> It is a Class 2 misdemeanor to sell or give for use as a beverage any alcoholic beverage to any person who is eighteen years of age or older but less than twenty-one years of age unless it is done in the immediate presence of a parent or guardian or spouse over twenty-one years of age. . . .

[¶39.] Kjellsen was an 18-year-old unmarried person at all times relevant to this case. Based on her testimony that Adamson frequently provided alcohol that she and others consumed in her home during the summer of 2005, we conclude

there was sufficient evidence for the jury to find Adamson guilty of furnishing alcohol to Kjellsen in violation of SDCL 35-9-1.1.

[¶40.]    Affirmed.

[¶41.]    SABERS, KONENKAMP, and ZINTER, Justices, concur.

[¶42.]    MEIERHENRY, Justice, concurs in part and dissents in part.


MEIERHENRY, Justice (dissenting in part and concurring in part).

[¶43.]    I dissent on issues one and two. After reviewing the record, it is my opinion that the trial court abused its discretion by not granting the defendant's motion relating to the last minute disclosure of the telephone records one week before trial. The late-disclosed evidence consisted of approximately 130 pages, which listed over 6500 phone calls from the cellular phone number 605-677-9077 dating from July 1, 2005, to April 17, 2006. The question is not whether the State was diligent in turning over the records when it received them; the question is whether the late disclosure prejudiced the defendant in preparing a defense. State v. Krebs, 2006 SD 43, ¶19, 714 NW2d 91, 98-99 (citing State v. Michalek, 407 NW2d 815, 818-19 (SD 1987)). Mr. Butler pointed out to the trial court that he needed more time to investigate who was using the cellular phone, who was on the other end of the call, whether the call terminated in a conversation with someone at the number dialed, and if so, the length of the conversation. Mr. Butler asked to exclude the records at trial, or in the alternative, for more preparation time in order to counter the State's claim that the calls in some way proved the rape and the tampering charges against Adamson.

[¶44.] The trial court denied the defense motion because the records were the defendant's own records and thus he had "the ability to get [them] from his company at any time." That may be true; however, he did not know until a few days before trial that the State intended to use the phone records from this cellular phone number as evidence against him. Adamson had several phone numbers that were used in conjunction with his business. It is unreasonable to expect that he could look at a listing of 6500 phone calls from several prior months and know who used the number to make the calls, who may or may not have been on the other end of the call or the content of the call if completed.

[¶45.] These phone records were integral to the State's theory of the case. As this Court stated in *State v. Krebs,* the probable effect of inculpatory evidence on a "jury is, in part, evidenced by its prominence in the State's final argument." 2006 SD 43, ¶22, 714 NW2d 91, 100. In closing argument, the State repeatedly draws the jury's attention to these phone records and the inference that Adamson "was talking to the witnesses in this case and he was doing it in a secretive manner." The State called A.M.B. as a witness and asked no questions of her concerning phone calls. The State asked only a few questions of A.M.B. concerning her age, when she met the defendant and her cellular phone number. The State also called Susan who testified about her conversations with the defendant. Susan does not testify that Adamson induced her or A.M.B. to testify falsely or to withhold testimony or information. Without direct evidence or testimony that Adamson intended to influence A.M.B. or Susan to lie or withhold testimony or information, the State relied on inferences drawn from the phone records as to the number of

calls, the alleged person contacted and the possible content of the phone calls to prove its case.

[¶46.]    In *State v. Packed,* we reaffirmed that "an accused must 'be afforded a meaningful opportunity to present a *complete* defense.'" 2007 SD 75, ¶27, 736 NW2d 851, 860 (citing State v. Iron Necklace, 430 NW2d 66, 75 (SD 1988) (citations omitted) (emphasis added)). When inculpatory evidence is included, or exculpatory evidence excluded, without affording a defendant an opportunity to respond to the State's case against him, he is "effectively deprived of a 'fundamental constitutional right to a fair opportunity to present a defense.'" *Id.* ¶27 (citing State v. Lamont, 2001 SD 92, ¶16, 631 NW2d 603, 608-09 (quoting Crane v. Kentucky, 476 US 683, 687, 106 SCt 2142, 2145, 90 LEd2d 636 (1986))).

[¶47.]    I would hold that the trial court abused its discretion by not granting the defendant's motion to exclude the phone records or by not continuing the trial to allow Adamson more time to prepare his defense.

[¶48.]    I also dissent on the second issue and would reverse because of insufficient evidence to support the jury verdicts as to the witness tampering counts. The majority concludes that there was sufficient evidence and that Adamson conferred a benefit on Susan and A.M.B. in order to influence their testimony by giving Susan $500.00 to retain an attorney. However, the testimony of the State's own witness belies the claim that the $500.00 was given to Susan in order to alter or influence her or A.M.B.'s testimony.

[¶49.] Susan testified under oath that the $500.00 was given as a loan and that she borrowed the money because she feared A.M.B. would face perjury charges. The following testimony was elicited from Susan at trial:

Q. Did Mr. Adamson ever threaten you to get you to testify differently or withhold information?
A. No.
Q. Did he ever promise to give you something if you would do that for him?
A. No.
Q. Did he ever make any threats about A.M.B.?
A. No.
Q. Did he ever promise that he would do something for her? Give her money? Give her something?
A. No.

[¶50.] Susan also testified that she grew more and more concerned that she needed an attorney because of conversations with a DCI agent about A.M.B. Susan testified that a DCI agent had informed her that, as a result of the incident with Adamson, A.M.B. could be taken away from her and she could be charged with neglecting A.M.B. These were the concerns that led Susan to seek out an attorney and ask for $500.00 from Adamson.

[¶51.] The State's evidence is that Adamson gave Susan money to hire a lawyer for A.M.B. in order that A.M.B.'s rights were protected. The State claims this money was intended to induce A.M.B. to testify falsely. Yet with advice from A.M.B's own lawyer, it would be more likely that she would testify truthfully.

[¶52.] When we determine the "sufficiency of the evidence on review, the question presented is whether there is evidence in the record, which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt" accepting all the evidence and drawing the most favorable inferences "fairly drawn

#24148

therefrom, which will support the verdict." State v. Knecht, 1997 SD 53, ¶22, 563 NW2d 413, 421.

[¶53.]     All the State had was a list of dialed numbers from Adamson's cellular phone -- the recipient and content of which were unknown -- and the money Adamson gave to Susan to hire a lawyer for A.M.B. The list of dialed numbers does not prove that Adamson made the calls or that A.M.B. or Susan received the calls, and these are not fair inferences to draw from the unverified evidence presented. Even if one were to assume some of the calls were from Adamson to A.M.B. or Susan, the State presented no evidence that the subject of the phone calls was to induce them to lie in court. Additionally, giving a potential witness money to hire her own lawyer should not infer an intention to induce that witness to lie in court. Accepting all the evidence presented by the State and making all fair and reasonable inferences, the evidence is insufficient to prove beyond a reasonable doubt that Adamson was guilty of the witness tampering charges. I would reverse on issue one and two and affirm on the other two issues.